IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| SUSAN ACKERMAN,<br><br>        Plaintiff,<br><br>v.<br><br>STATE OF IOWA, IOWA WORKFORCE DEVELOPMENT, TERESA WAHLERT, TERESA HILLARY, DEVON LEWIS, BETH TOWNSEND, and JON NELSON,<br><br>        Defendants. | CASE NO. 4:18-cv-00363<br><br><br><br>**DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT**<br><br>**ERRATA** |

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................................ 3

SUMMARY JUDGMENT STANDARDS .................................................................................. 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 3

ARGUMENT .............................................................................................................................. 8

I.    ACKERMAN'S WHISTLEBLOWER CLAIM AND RELATED WRONGFUL
      DISCHARGE CLAIMS ARE SUBJECT TO SUMMARY JUDGMENT. .......................... 9

      A. The Adverse Action Against Ackerman Was Not Taken in Response to Any
         Alleged Whistleblower Statements. ................................................................................ 9

II.   ACKERMAN'S WRONGFUL DISCHARGE CLAIM MUST FAIL .................................. 12

      A. Defendants had a Legitimate Reason for Terminating Ackerman's Employment. ....... 12

      B. Ackerman's Whistleblower Claim Under Section 70A.28 Precludes Her from
         Bringing a Wrongful Termination Claim ...................................................................... 12

III.  TERESA WAHLERT IS ENTITLED TO SUMMARY JUDGMENT ON
      ACKERMAN'S DEFAMATION CLAIMS ....................................................................... 13

      A. Ackerman Cannot Show That Defendant Wahlert's Statements Were
         "Published." .................................................................................................................. 14

B. Ackerman Cannot Show that Defendant Wahlert's Statements Were False. ................ 15

C. Defendant Wahlert's Statements Are Qualifiedly Privileged. ....................................... 16

D. There is No Evidence in the Record of Any Reputational Harm to Plaintiff................. 17

E. Ackerman's Claims Fail Under the Doctrine of Sovereign Immunity.......................... 17

F. Ackerman Cannot Show Actual Harm as a Result of Statements................................. 19

IV.   ACKERMAN'S § 1983 CLAIM FOR VIOLATION OF FREE SPEECH IS
      SUBJECT TO SUMMARY JUDGMENT FOR MULTIPLE INDEPENDENT
      REASONS ........................................................................................................................ 20

      A. There Were No Adverse Actions Taken as a Result of Any of Ackerman's
         Statements Before the Oversight Committee. ................................................................ 21

      B. Defendants Would Have Reached the Same Decision to Terminate Ackerman
         Regardless of Her Testimony. ........................................................................................ 21

      C. Ackerman has Failed to Articulate How Each Individual Defendant's Actions
         Violated Her Right to Free Speech. ............................................................................... 24

V.    ACKERMAN CANNOT MAINTAIN HER INTENTIONAL INFLICTION OF
      EMOTIONAL DISTRESS CLAIM AS A MATTER OF LAW ........................................... 26

      A. Ackerman Cannot Establish the Elements of Her Intentional Infliction of
         Emotional Distress Claim............................................................................................... 26

VI.   ACKERMAN'S FIRST AMENDMENT CLAIMS UNDER THE IOWA
      CONSTITUTION ARE BARRED. .......................................................................................... 32

      A. Ackerman's State Law First Amendment Claim is Barred by the Eleventh
         Amendment to the U.S. Constitution. ............................................................................ 32

      B. If Article 1, § 7 of the Iowa Constitution is Self-Executing Such That It Can
         Sustain a Claim for Damages, the Individual Defendants Are Entitled to
         Immunity Under Baldwin's All Due Care Standard. ..................................................... 34

CONCLUSION.................................................................................................................................. 35

## PRELIMINARY STATEMENT

Defendants request this Court grant summary judgment in their favor and against Plaintiff Susan Ackerman pursuant to Federal Rule of Civil Procedure 56 and on the grounds that undisputed material facts establish the Defendants are entitled to judgment as a matter of law. This Brief in Support Defendants' Motion for Summary Judgment is filed contemporaneously with the Defendants' Motion for Summary Judgment pursuant to Local Rule 56(a)(2).

## SUMMARY JUDGMENT STANDARDS

The court should grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord *United States v. Story Cnty.*, 28 F. Supp. 3d 861, 867 (S.D. Iowa 2014). While the Federal Rules of Civil Procedure give "[d]ue deference" to the "rights of litigants to have their claims adjudicated by the appropriate finder of fact . . . equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy, and inexpensive determination of the action where the claims have no factual basis." *Anderson v. Indus. Elec. Reels, Inc.*, 812 F. Supp. 999, 1002 (D. Neb. 1993). Consequently, summary judgment is appropriate where resolution of a question of law is controlling. *See Ferezy v. Wells Fargo Bank, N.A.*, 755 F. Supp. 1010, 1013 (S.D. Iowa 2010).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In 1999 Ackerman began her employment with the State of Iowa as an administrative law judge (ALJ) at the women's correctional facility in Mitchellville. (SOF ¶ 8). While working at the Mitchellville facility Ackerman met Monica Reynolds who worked in human resources. (SOF ¶ 9). In October 2000, Ackerman, with the help of Reynolds who had previously transferred to Iowa Workforce Development (IWD), requested and successfully transferred to the IWD retaining her

position as an ALJ. (SOF ¶¶ 11-12). In Ackerman's new role, she was tasked with hearing contested cases involving terminated employees and determining whether they were entitled to unemployment compensation benefits. (SOF ¶ 13). Ackerman remained in that position until her termination in January of 2015. (SOF ¶ 70).

Ackerman has a daughter (Catherine) that was residing in Hawaii with her husband until 2012, when the daughter and her husband separated, but did not divorce. (SOF ¶¶ 15-17). Ackerman, in late 2012, enrolled her daughter as a beneficiary on Ackerman's employee health insurance plan for the calendar year of 2013. (SOF ¶ 23). In order for a non-dependent adult child over the age of 26 to be covered under the state employee's health insurance plan the employee must certify that the child is both a full-time student and unmarried. (SOF ¶ 18).

An email exchange between Ackerman and Reynolds on October 31, 2012, reveals that both Reynolds and Ackerman knew that Catherine was married and acknowledged that Catherine was ineligible to receive coverage under the Ackerman's plan because of her marital status. (SOF ¶ 22).

> **Ackerman:** Hey, I've looked at the web site for the dependent tax consequences and it seem that I can only get coverage for Catherine if she in unmarried???
>
> **Reynolds:** I thought Catherine was unmarried??
>
> **Ackerman:** No, her husband is still in Hawaii but will probably be moving back here next year.
>
> **Reynolds:** Who has to know she is married??

(SOF ¶ 22).

Disregarding the requirements for coverage, Ackerman falsely certified that Catherine was unmarried and Monica Reynolds, the human resource employee that had previously aided the Ackerman in her transfer to IWD, electronically added Ackerman's daughter to Ackerman's policy

on October 31, 2012. (SOF ¶¶ 15-25, 48). At this time, it is undisputed that Catherine, Ackerman's daughter, was still married. (SOF ¶ 69). Despite having this knowledge, in the fall of 2013 Ackerman again re-enrolled her daughter for coverage under her plan for calendar year 2014. (SOF ¶¶ 24-31). Ackerman again completed the form called "Certification of Full Time Student Status," which again clearly stated "You may enroll your <u>unmarried</u> full-time student on your insurance plan." (SOF ¶ 27). On November 15, 2013, Ackerman signed that form once again certifying that her daughter was not married. (SOF ¶ 27-30). It is undisputed that on that date, Catherine remained married. (SOF ¶ 69). The form included the following statement:

> I am providing this information to my employer for Insurance enrollment and tax reporting purposes. By signing and returning this form, I certify that all of the statements above are true. I understand that my employer will rely on this information to calculate the taxability of coverage provided to my full-time student over age 26. In addition, I certify that this full-time student is unmarried. If my full-time student's status changes, I will notify my employer immediately by submitting that information, in writing, to my Personnel Assistant.

(SOF ¶ 30).

During this same period of time there was a great deal of turmoil surrounding IWD and its Director, Teresa Wahlert. (SOF ¶ 108). Complaints were made to state legislators regarding various matters including complaints from some ALJs that Ms. Wahlert was exerting pressure for ALJ's to rule in a more employer-friendly fashion. (SOF ¶ 108). In August of 2014, the Iowa Senate Government Oversight Committee initiated hearings before it related to complaints involving IWD. (SOF ¶ 109). On August 26, 2014 Plaintiff, along with another ALJ and a former ALJ appeared before the Oversight Committee and described their impressions of the atmosphere within IWD and specifically the Bureau housing the ALJs. (SOF ¶ 110). The next day, Director Wahlert appeared before the Oversight Committee and responded to questions from legislators. (SOF ¶ 113). Comments made by Director Wahlert regarding Plaintiff or others within IWD were

in response to questions and/or issues raised by the legislators or by Ackerman and her colleagues the previous day. (SOF ¶ 113). There is no dispute that Ackerman suffered no adverse action in the months following her testimony to the Oversight Committee and she admits that Wahlert never, at any time, took action that resulted in any reassignment, demotion, suspension, loss of pay, or anything else that would fit the definition of an adverse employment action. (SOF ¶ 116).

It was not until the fall of 2014, when Ackerman once again went to re-enroll Catherine under her benefits program, that it came to light that Catherine was still married at times relevant to her coverage under Ackerman's plan. (SOF ¶¶ 33-52). While Ackerman's daughter was fraudulently covered by the State's insurance program, the plan paid thousands of dollars to health care providers on her behalf. (SOF ¶ 77). An administrative investigation regarding Ackerman's behavior was initiated on December 11, 2014, and Ackerman was placed on administrative leave with full pay and benefits by Human Resources Manager Jon Nelson. (SOF ¶ 50). Defendant Nelson led the investigation into Ackerman's conduct. (SOF ¶¶ 53-69). During the investigation, Ackerman claimed that she was only doing what her HR Specialist had told her to do. (SOF ¶¶ 55). Ackerman further asserted that she did not believe her daughter was still married because she had separated from her husband, though she acknowledged at the time of her deposition that she was aware that the two were not legally divorced. (SOF ¶¶ 67-68). This was despite the fact that Ackerman had demonstrated her knowledge that dependents could not be on her policy after they were married; Ackerman had previously removed her son from her coverage after he was married. (SOF ¶¶ 31-32). IWD's investigation concluded that Ackerman had, in fact, falsely represented on official State records that her daughter was unmarried when the Ackerman was fully aware of her daughter's marital status, for the purpose of obtaining insurance benefits for her daughter. (SOF ¶¶ 53-69). Following the investigation, which concluded on January 30, 2015, Ackerman was

terminated. (SOF ¶ 70). The termination decision was made by Ackerman's supervisor, Steve Slater, and Slater signed the termination letter. (SOF ¶¶ 70-76). It is undisputed that Wahlert, who resigned from IWD prior to Ackerman's termination, played no role in the termination decision. (SOF ¶¶ 115-117, 127). At the time of Ackerman's termination, Beth Townsend was the interim Director of IWD, having started in that role in December of 2014 after previously serving for several years as the Director of the Iowa Civil Rights Commission. (SOF ¶¶ 3, 118).

Ackerman's termination, and the reasons for her termination, were communicated to her during a meeting and via a termination letter on January 30, 2015. (SOF ¶ 70). The letter stated that Ackerman had violated Iowa Workforce Development Rules by the deliberate falsification of materials and giving false information to other government agencies; violated State of Iowa Employee Handbook Rules with dishonest conduct and "conduct unbecoming a public employee and misconduct"; and violated Iowa Code Chapter 32 – Iowa Rules of Professional Conduct by engaging in conduct "involving dishonesty, fraud, deceit, or misrepresentation." (SOF ¶¶ 70-75). Ackerman acknowledges these were the reasons relied upon by IWD in terminating her employment. (SOF ¶ 76).

After Ackerman's termination, she filed a Step 2 grievance with the Department of Administrative Services ("DAS") and AFSCME represented Ackerman's interests. (SOF ¶ 87). A Step 2 meeting was held on May 14, 2015, and on June 15, 2015, DAS issued a decision denying the grievance. (SOF ¶¶ 87-97). AFSCME filed a timely appeal of the DAS decision and the parties went to arbitration. (SOF ¶ 97). On January 29, 2016, the arbitrator issued a decision in favor of the State finding that the State had "fairly and even handedly determined that there was substantial evidence of misconduct." (SOF ¶¶ 100-101). It further found that because Ackerman was a judge for the State of Iowa, the degree of discipline was appropriate. (SOF ¶ 101).

The arbitration decision was appealed to the Iowa District Court on April 19, 2016. (SOF ¶ 103). After hearing the district court entered its decision affirming the arbitration decision. (SOF ¶¶ 104-106). The district court found there was substantial evidence to support the arbitrator's conclusion that Ackerman and Reynolds "worked in concert to conceal [Ackerman's] dishonesty." (SOF ¶ 104). It was further affirmed that Ackerman knew Catherine was married at the times she certified otherwise and that "…she did lie to obtain a financial benefit of more than $7,000." (SOF ¶ 104). The District Court concluded "there is clearly substantial evidence supporting his conclusions on those issues." The decision of the district court was not appealed. (SOF ¶ 105).

Ackerman's behavior was also referred to the Iowa Supreme Court Disciplinary Board. (SOF ¶ 84). On July 8, 2015, although the Board ultimately decided that the behavior did not amount to an ethical violation and dismissed the complaint, the Board noted that the "false certification" was "troubling" and strongly cautioned Ackerman to "avoid similar, future conduct." (SOF ¶ 85).

Finally, Ackerman's conduct was investigated independently by the Iowa Division of Criminal Investigation (DCI) and the results of that investigation forwarded to the Polk County Attorney's office for review. (SOF ¶¶ 79-81). After reviewing the investigation prosecutors brought criminal charges against Ackerman. (SOF ¶ 82). Eventually those charges were dismissed on statute of limitations grounds. (SOF ¶ 83).

Additional facts will be discussed below.

## ARGUMENT

In her Fifth Amended Complaint, Ackerman alleges six distinct claims: first, that her termination was retaliatory in violation of Iowa Code § 78A.28, the whistleblower statute (Count I, stated against Defendants IWD, the State of Iowa, Wahlert, and Townsend); defamation against

Defendant Teresa Wahlert (Count II); that the individual Defendants, sued in their personal capacities, violated her First Amendment rights under 42 U.S.C. § 1983 (Count III); that the Defendants intentionally inflicted emotional distress upon her (Count IV); that her termination was in violation of public policy (Count V, stated against Defendants IWD and the State of Iowa); and that the Defendants violated her free speech rights under the Iowa Constitution (Count VI). Ackerman fails on all six of these claims and will be unable to rebut the undisputed facts in this case at trial to overcome her burden.

## I.  ACKERMAN'S WHISTLEBLOWER CLAIM AND RELATED WRONGFUL DISCHARGE CLAIMS ARE SUBJECT TO SUMMARY JUDGMENT.

### A.  The Adverse Action Against Ackerman Was Not Taken in Response to Any Alleged Whistleblower Statements.

In August of 2014, the Iowa Senate, controlled at that time by the Democratic party, held a Government Oversight Committee ("Oversight Committee") meeting to hear concerns about IWD and its Director Teresa Wahlert, who had been appointed by Republican Governor Branstad. (SOF ¶ 109). Ackerman appeared at that hearing and testified that she was opposed to the new policy reducing work from home hours and felt pressure from the Director (Wahlert) to rule in favor of employers in unemployment hearings. (SOF ¶¶ 110-111). Her statements regarding Wahlert, Ackerman alleges, should be protected under Iowa Code section 70A.28. Even if Ackerman's statements are protected under section 70A.28, she cannot establish that any adverse action taken against her by her employer was done in retaliation for her statements at the hearing.

In order to establish her case under section 70A.28 Ackerman must prove to the court[1] 1) that she engaged in protected activity (disclosed information that she reasonably believed was evidence of a law violation or mismanagement to an appropriate official); 2) that she suffered an

---

[1] Statutory whistleblower claims are tried to the court and only equitable relief is available. *Hedlund v. State*, 930 N.W. 2d 707, 718 (Iowa 2019).

adverse employment action; 3) that she was discharged as a reprisal for her protected disclosure. *Zwanziger v. O'Brien*, No. 11-1548, 2012 WL 4513836, at n. 4 (Iowa App. Oct. 3. 2012), citing *Yockey v. State*, 540 N.W. 2d 418, 422 (Iowa 1995); *see also Department of Homeland Security v. MacLean*, 135 S. Ct. 913, 918-19 (2015).

The only employment action taken against Ackerman that can be considered "adverse" was the termination of her employment.[2] Ackerman's termination was based upon her false certification of health insurance forms where she certified, multiple times, that her daughter was unmarried and eligible for insurance when in fact she was not unmarried. (SOF ¶¶ 15-39). In fact, Ackerman admits that the false certifications were the reasons IWD relied upon for the termination of her employment. (SOF ¶ 76). Further, Ackerman was suspended with pay on December 11, 2014—over three months after her Oversight Committee testimony—and not terminated until January 30, 2015, some five months after her appearance before the Oversight Committee. (SOF ¶¶ 50, 70). Thus, there is an insufficient temporal relationship between any claimed protected activity and any alleged adverse action. *See Tyler v. University of Arkansas*, 628 F. 3d 980, 986 (8th Cir. 2011) ("Inference of retaliation vanishes altogether when time gap between protected activity and the adverse employment action is measured in months."). Finally, none of the other ALJs that testified before the Oversight Committee with complaints similar to Ackerman's were ever put under an investigation or disciplined at all. (SOF ¶ 126). There is no evidence in the record that even leads to an inference of retaliation let alone evidence that could lead to any rational conclusion that Ackerman was retaliated against for engaging in any activity protected under Iowa Code section 70A.28.

---

[2] Being placed on paid suspension is not an adverse employment action. *Singletary v. Missouri Department of Corrections*, 423 F. 3d 886, 891-92 (8th Cir. 1995); *Randall v. Allison-Bristow Community School District*, 528 N.W. 2d 588, 592 (Iowa 1995) (employees' property interests not adversely affected by suspension with pay).

More significantly yet, the person Ackerman complained about to the Oversight Committee (Wahlert) was not involved in the termination of Ackerman's employment and the person alleged to be involved in Ackerman's termination (Townsend) was not related in any way to any complaints made by Ackerman at the Oversight Hearing. (SOF ¶¶115-120). Ms. Ackerman's claims, brought under Iowa's whistleblower statute (Iowa Code section 70A.28), name former IWD Director Teresa Wahlert and current IWD Director Beth Townsend as the persons alleged to have retaliated against her. (5th Amended Complaint at ¶¶ 75-76). However, the disconnect between any alleged protected activity (whistleblowing) by Ackerman and any adverse employment action claimed by Ackerman is striking. (SOF ¶¶ 108-129). Ackerman claims that she made statements to legislators when she testified before the Iowa Senate Government Oversight Committee meeting in August of 2014 that were critical of then IWD Directory Teresa Wahlert. (SOF ¶¶ 110-111). Yet, it is undisputed that Ms. Wahlert had nothing to do with Ackerman's termination from employment as Wahlert had resigned prior to Ackerman's termination. (SOF ¶ 115). Ackerman also acknowledges that Wahlert had never taken any action against her that resulted in a demotion, suspension, loss of pay, or anything else that could be considered an adverse employment action. (SOF ¶ 116). Thus, there is not and cannot be any causal relationship between anything that Ackerman may have said to the Oversight Committee and any adverse employment action that could relate to Wahlert.

This same sort of disconnect is even more evident with respect to Beth Townsend. Townsend was not even employed at IWD at the time Ackerman made her comments to the Oversight Committee. (SOF ¶¶ 3, 118-120). Ackerman made no comments related in any way to Townsend and did not even know Townsend until she assumed first the role as IWD interim director and then director. (SOF ¶¶ 119, 124). Even assuming Townsend had some role in the

termination of Ackerman's employment, there is zero evidence in the record that Townsend's involvement in ending Ackerman's employment was related in any way to any whistleblowing by Ackerman. As there is no connection between any alleged protected activity and any adverse employment action, Ackerman's whistleblower claim fails.

## II.    ACKERMAN'S WRONGFUL DISCHARGE CLAIM MUST FAIL.

### A.    Defendants had a Legitimate Reason for Terminating Ackerman's Employment.

The same disconnect between any alleged protected activity and any alleged adverse action that warrants summary dismissal of Ackerman's Whistleblower claim also prevents any claim for wrongful discharge (Count V) based on Ackerman's alleged whistleblowing. In other words, Ackerman's complaints to the legislature about Teresa Wahlert, who was not involved in her termination, are clearly not actionable as Ackerman has failed to connect them to the events surrounding her termination or the individuals involved in the decision to terminate her. Conversely, persons who may have been involved in the decision to terminate Ackerman (Slater, Nelson, and Townsend) were not the subjects of Ackerman's complaints to the legislature and cannot be connected to the statements made before the Oversight Committee. (SOF ¶ 127). Thus, for the same reasons Ackerman's claim under Iowa Code section 70A.28 must be dismissed, the intertwined common law wrongful discharge claim must also be dismissed.

### B.    Ackerman's Whistleblower Claim Under Section 70A.28 Precludes Her from Bringing a Wrongful Termination Claim.

As a state employee, Ackerman had multiple avenues of redress under both statutory remedies and contract remedies under a collective bargaining agreement which, at the time of her termination, offered robust remedies including express whistleblower protection. *See Ackerman v. State*, 913 N.W.2d 610, 622 (Iowa 2018) (Waterman, J. dissenting). Subsequent to the afore-cited *Ackerman* case, the Iowa Supreme Court squarely addressed the question "presented but not

preserved in *Ackerman v. State*, 913 N.W. 2d 610, 621-22 (Iowa 2018)." *Ferguson v. Exide Technologies, Inc.*, 936 N.W. 2d 429, 434 (Iowa 2019). In *Ferguson*, the Iowa Supreme Court expressly decided that when "the legislature includes a right to civil enforcement in the very statute that contains the public policy a common law claim would protect, the common law claim for wrongful discharge in violation of public policy becomes unnecessary." *Id*. at 434-35. The Court then states, "thus we hold that when a civil cause of action is provided by the legislature in the same statute that creates the public policy to be enforced, the civil cause of action is the exclusive remedy for violation of that statute." *Id*. at 435. Based on the foregoing unambiguous determination by the Iowa Supreme Court, Ackerman's wrongful discharge claim must be dismissed as a matter of law due to the creation of a civil cause of action by Iowa Code section 70A.28.

## III. TERESA WAHLERT IS ENTITLED TO SUMMARY JUDGMENT ON ACKERMAN'S DEFAMATION CLAIMS.

Ackerman claims that Defendant Teresa Wahlert, former director of IWD, made defamatory statements against her when Wahlert was called to testify at the Iowa Senate Government Oversight Committee Hearing ("Oversight Hearing") on August 27, 2014. (SOF ¶ 113). Ackerman was unable at the time of her deposition to identify which of Wahlert's statements she claims were defamatory, but rather referred to the entirety of Defendant Wahlert's Oversight Hearing testimony.[3] (Ackerman 125:18-126:9; App. 42). As an initial matter, Ackerman's failure to indicate which specific statements form the basis of her claim is sufficient, in and of itself, to justify the Court's decision to dismiss her defamation claims. Though Ackerman

---

[3] Defendant Wahlert's Senate Oversight Hearing Testimony of August 27, 2014 can be found at https://www.youtube.com/watch?v=7Yq9fgWLIdE. Wahlert's testimony begins at the 5-hour, 17-minute mark. The previous day's testimony can be found at https://www.youtube.com/watch?v=7FR1rd56txk.

does not point to specific defamatory statements made by Defendant Wahlert, Defendants believe that Ackerman takes issue with Wahlert's Oversight Hearing testimony in which she stated that Ackerman had recently failed two Department of Labor ("DOL") reviews.

In Iowa, a defamation claim may be brought under two distinct theories: *defamation per quod* and *defamation per se. Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 46 (Iowa 2018), citing *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). Defamation per quod "refer[s] to the facts or circumstances beyond the words actually used to establish the defamation." *Id.* In proving defamation per quod, a party must prove "(1) publication, (2) a defamatory statement, (3) falsity, (4) maliciousness, (5) the statement was of or concerning the party, and (6) a resulting injury." *Id.*, citing *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013). Alternately, a claim of defamation per se exists where a statement has a "natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Id.*, citing *Johnson*, 542 N.W.2d at 510. Claims of defamation per se are typically supported by accusations that the party in interest is a liar; that the person has committed an "indictable crime of moral turpitude that carries a jail sentence"; that the person engaged in fraud; or that the person committed adultery. *Bandstra*, 913 N.W.2d at 47. Ackerman's claims fit most comfortably within a defamation per quod analysis, as she does not claim that Defendant Wahlert accused her of any conduct so severe as to form the basis of a defamation per se claim. Ackerman's defamation per quod claim fails, as she cannot meet factors 1, 2, 3, 4, or 6.

## A. Ackerman Cannot Show That Defendant Wahlert's Statements Were "Published."

To prove that Wahlert's statements were properly "published," Ackerman must demonstrate not only that the statement was made "to one or more third persons," which it certainly

was, but also that those individuals listening to the statement understood it to be defamatory. *Id.* at 47, citing *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). "Whether a listener understands a statement to be defamatory requires viewing the statements 'in the context of the surrounding circumstances and within the entire communication.'" *Id.* Here, Wahlert's testimony was provided in response to comments by a committee member criticizing Administrative Law Judge Teresa Hillary's job performance. (SOF ¶ 113). Wahlert responded to those criticisms by pointing out that each of the Administrative Law Judges ("ALJs") she supervised, including Ackerman, had engaged in conduct warranting similar criticism. (SOF ¶ 113). Individuals listening to Wahlert's statements would not have perceived them to be slanderous, but rather, responsive to the committee's commentary and intended to provide context regarding the job performance of various ALJs.

### B. Ackerman Cannot Show that Defendant Wahlert's Statements Were False.

The Iowa Supreme Court has outlined a test to be utilized in determining whether a statement is factual or a protected opinion. *Bandstra*, 913 N.W.2d at 47. Statements are factual in nature where, with consideration of the context in which the statement is made, they have a "precise core meaning" for which "a consensus of understanding exists" and are "objectively capable of proof or disproof." *Id.* A statement conveying that Ackerman failed a DOL review can reasonably interpreted as "stating actual facts." *Id.* at 47. Such a statement is objectively "capable of being proven true or false." *Id.* Indeed, Ackerman's statement relating to the failed DOL reviews is demonstrably true. (Deposition Exhibit 55; App. 314-18). Truth is a complete defense to a defamation claim under Iowa law. *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). As such, Ackerman's defamation claim fails.

### C. Defendant Wahlert's Statements Are Qualifiedly Privileged.

Even if this Court determines that Defendant Wahlert properly published a defamatory, false statement during the Oversight Hearing, it must determine that her statements were qualifiedly privileged. A communication is qualifiedly privileged if

> (1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

*Bandstra*, 913 N.W.2d at 47-48, citing *Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004). Qualified privilege may be lost where the speaker abuses the privilege by "speaking with actual malice." *Id.* at 48. "A statement is made with actual malice if the speaker 'acted with knowing or reckless disregard of the truth of the statement.'" *Id.* Here, any statements made by Defendant Wahlert during the Oversight Hearing were made in good faith, under oath, and in the context of her responsibilities as then-Director of Iowa Workforce Development. (SOF ¶ 113). Wahlert could not have spoken with "knowing or reckless disregard of the truth of the statement," as Wahlert's statements relating to Ackerman were demonstrably true. (Deposition Exhibit 55; App. 314-18). Additionally, Wahlert's statements were limited to the context of Ackerman's job performance as an ALJ under Wahlert's supervision, and made with the intention of upholding the interests of IWD. (SOF ¶ 113). Further, Wahlert's statements were confined to the Oversight Hearing setting and made in response to comments by committee members—not made unprompted to unrelated audiences. (SOF ¶ 113). As such, her statements were made on a proper occasion, in a proper manner, and to proper parties. *See Bandstra*, 913 N.W.2d at 47-48, citing *Barreca*, 683 N.W.2d at 118. Absent any evidence that Wahlert acted with actual malice, this Court should determine that Ackerman's defamation claim fails on the basis of qualified privilege.

**D.      There is No Evidence in the Record of Any Reputational Harm to Plaintiff.**

Ackerman has not pled, nor is there anything in the record to show, that any of the purported statements by Wahlert constituted defamation. Thus, Ackerman's claims must fail unless she is able to prove some injury as a result of the alleged defamatory statements. In this case, Ackerman's ultimate termination happened *months* after the testimony was received by the Oversight Committee and the testimony was in no way related to the reason for Ackerman's termination. (*Compare* SOF ¶ 112-113 *with* SOF ¶ 70). In fact, it is undisputed that Wahlert had no part in Ackerman's termination. (SOF ¶ 127). Ackerman cannot point to any facts that establish her reputation was harmed by any statement made by Wahlert or that she suffered any other adverse consequences as a direct result of any statements made by Defendant Wahlert. "The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which defamed, reputation which is injured, and reputation which is protected by the law of defamation." W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 111, at 771 (5th ed. 1984). As such, Ackerman's defamation must be dismissed.

**E.      Ackerman's Claims Fail Under the Doctrine of Sovereign Immunity.**

Alternatively, Defendant Wahlert is immune from suit under the doctrine of sovereign immunity and is thereby entitled to summary judgment as a matter of law on the defamation claim. The State of Iowa, through the Iowa Tort Claims Act, waived sovereign immunity for only certain matters that fit under the definition of the term "claims" as defined in the Act. Iowa Code § 669.2(3). The Iowa Tort Claims Act, however, specifically lists exceptions to this waiver of sovereign immunity for a variety of claims. *See* Iowa Code § 669.14. The twin torts of libel and slander, which make up a claim for defamation, are expressly listed exceptions. As such,

Defendant Wahlert, is immune from Plaintiff's defamation claim. Iowa Code §§ 669.14(4), 669.23; *Dickerson v. Mertz*, 547 N.W.2d 208, 212 (Iowa 1996).

Ackerman attempts to get around these longstanding immunities by claiming that Wahlert was acting outside the scope of her employment and in her "individual" capacity. If this was true, then Ackerman could correctly argue that the defamation claim must proceed outside the Iowa Tort Claims Act until the fact finder, or the court by way of summary judgment, can establish the Defendant at the time of the alleged acts was acting within the scope of her employment. *See Godfrey v. State*, 847 N.W.2d 578, 586 (Iowa 2014). However, the question of scope of employment can be resolved if the record reveals a conflict concerning only the legal consequences of undisputed facts. *Id.* If scope of employment is established, then the Iowa Tort Claims Act applies, and the State should take the place of any individual defendants. *Id.*; Iowa Code § 669.5. Once that substitution occurs sovereign immunity applies and the claims of defamation must be dismissed as a matter of law. *See Genetzky v. Iowa State Univ.,* 480 N.W.2d 858, 861 (Iowa 1992); Iowa Code §§ 669.14(4), 669.23. Here, it is clear that Wahlert was acting within the scope of her employment at all times.

Furthermore, the State has not waived sovereign immunity for defamation claims. Iowa Code § 669.14(4) (stating waiver does not apply to "any claim arising out of assault, battery, false imprisonment, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights"); *see also Jones v. Univ. of Iowa*, 836 N.W.2d 127, 142 (Iowa 2013) (holding defamation claims against state and its employees were barred by the Tort Claims Act); *Genetzky v. Iowa State Univ.*, 480 N.W.2d 858, 861 (Iowa 1992) (holding the State of Iowa had not waived sovereign immunity for a defamation claim). Accordingly, Defendant Wahlert is

immune from defamation suits, and the State as an entity is entitled to summary judgment as a matter of law.

Summary judgment on scope of employment and resultant sovereign immunity is clear. The undisputed facts indicate that Defendant Wahlert was acting within the scope of her employment at all times relevant to the facts at issue in this case. Plaintiff has not and cannot present any evidence whatsoever that Wahlert was acting outside the scope of her office or employment as Director of IWD. Defendant Wahlert testified at the Oversight Hearing in her capacity as the Director of IWD. (SOF ¶ 113). Defendant Wahlert spoke about her professional qualifications and experiences as Director of IWD, and her testimony not only included responses related to Ackerman's work but also about the other ALJs under her supervision. (SOF ¶ 113). As an individual citizen acting in her individual capacity, Wahlert would be unable to supervise Ackerman or any other ALJs or to testify at an Oversight Hearing regarding that supervision. As such, Wahlert was acting within the scope of her employment when she testified before the Oversight Committee, and Ackerman's defamation claim must be dismissed.

### F. Ackerman Cannot Show Actual Harm as a Result of Statements.

Ackerman is unable to point to any facts related to the harm she purportedly suffered as a direct consequence of the statements made by Defendant Wahlert to the Oversight Committee. Defendant Wahlert's opinions about the practices and work performance of the ALJs are not actionable on their own. The Restatement indicates that where the basis for an opinion is made clear, it is not actionable defamation: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (Second) of Torts § 566

at 170. The statements Defendant Wahlert made about Ackerman do not rise to the level of actionable defamation and Defendants are entitled to summary judgment on the defamation claim.

## IV. ACKERMAN'S § 1983 CLAIM FOR VIOLATION OF FREE SPEECH IS SUBJECT TO SUMMARY JUDGMENT FOR MULTIPLE INDEPENDENT REASONS.

Ackerman claims that statements she made before the Senate Oversight Committee were the direct cause of her termination from IWD and that this termination was retaliatory in violation of her federally protected First Amendment rights. (Fifth Am. Compl. ¶¶ 84-91). "A public employer 'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" *McGee v. Public Water Supply, Dist. No. 2 of Jefferson County, Mo.*, 471 F.3d 918, 919 (8th Cir. 2006) (quoting *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)). First, the court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006). Once the speech is determined to be protected as a matter of law by the court, the statement must survive a balancing test "between the interests of the [employee], as a citizen, in commenting upon matter of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968).

Although Ackerman may be able to establish that her sworn testimony before the committee was protected speech, Ackerman fails to establish a prima facie case of retaliation. "To establish a prima facie case of retaliation, a plaintiff must allege and prove that: (1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action." *Davison v. City of Minneapolis, Minn.*, 490 F.3d

648, 654-55 (8th Cir. 2007), citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). However, even if Ackerman were able to establish these requirements, which she cannot, the Defendants would still prevail because "the same employment action would have been taken in the absence of the protected activity." *Davison*, 490 F.3d at 655. Ackerman cannot present any evidence which demonstrates a connection between the individuals who terminated her employment and her protected testimony, nor can she rebut the legitimacy of her termination.

A.     **There Were No Adverse Actions Taken as a Result of Any of Ackerman's Statements Before the Oversight Committee.**

Ackerman cannot show that her termination was the result of her testimony before the Senate Oversight Committee. Ackerman's position with regard to her employment did not change after the Senate Oversight Committee hearings. (SOF ¶¶ 15-52, 116). Her position only changed after evidence came to light that she had fraudulently acquired State insurance for her daughter. *See Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007) ("Altonen has the burden of proving that the alleged employment action adversely and materially altered the terms or condition of her employment. . . [t]here is no evidence in the record that Altonen's position changed in any way[.]") (internal citations omitted); (SOF ¶ 50, 70). Transcripts of the interviews and other documentation of the investigation process reveal that the substance of the investigation was related to the insurance forms and not to Ackerman's testimony before the Oversight Committee. (SOF ¶¶ 53-69). There is no correlation between her protected speech and her termination. Ackerman cannot establish her prima facie case with respect to the second and third prong.

B.     **Defendants Would Have Reached the Same Decision to Terminate Ackerman Regardless of Her Testimony.**

Even in the event that Ackerman can establish a prima facie case of retaliation, Defendants easily meet their burden to show that they would have made the same decision regardless of

Ackerman's testimony. Ackerman was aware that the IWD's work rules prohibited dishonesty and that dishonesty was a ground for termination. (SOF ¶ 71). Despite apparently understanding that dishonesty was a terminable offense, Ackerman argued before the District Court that others at IWD who had engaged in similar conduct received lesser discipline. (SOF ¶¶ 103-106, App. 290-91). However, the District Court, reviewing the arbitration decision, noted that the State had presented a "laundry list" of cases before the arbitrator demonstrating that other employees had been terminated when evidence was substantiated that they had falsified records. (SOF ¶¶ 103-106, App. 290-91).

Further, Plaintiff's § 1983 claim fails when met with Defendants' same decision defense. In *Davison*, the plaintiff, a captain of a fire department, was denied a promotion. *Davison*, 490 F.3d at 651. Plaintiff alleged the employer's failure to promote was motivated by her protected speech. *Id.* However, the defendant-employer claimed it would have reached the same decision regardless of plaintiff's speech, because the plaintiff had not obtained the highest interview scores from the candidate pool and the employer's policy was to choose the candidate with the highest score. *Id.* at 658. The same reasoning applies in the present case, where the arbitrator and District Court agreed that IWD had terminated employees for conduct similar to Ackerman's in the past, evidencing a policy or practice of terminating employees for engaging in falsification of documents or fraud. (App. 272, 290-91). By providing evidence that the level of discipline issued to Ackerman was in line with that imposed on employees who had engaged in similar conduct, Defendants have demonstrated that they "would have made the same decision in the absence of her protected activities." *Davison*, 491 F.3d at 658.

During her deposition, Ackerman agreed that the reasons her employers relied upon in terminating her employment were not her comments before the Senate Oversight Committee, but

rather, her falsification of insurance documents. (SOF ¶ 76). Indeed, those involved in the investigation into Ackerman's conduct had no association with the Senate Oversight Committee hearings. (SOF ¶ 108-129). The Department of Administrative Services, the arbitrator, and the District Court all confirmed that substantial evidence existed in the record to support the contention that Ackerman knowingly lied about her daughter's marital status so that she could enroll her daughter on her health insurance plan. (App. 201-07, 261-69, 281-96). This lie resulted in monetary gain for Ackerman's daughter. (SOF ¶¶ 77, 104). This Court should also determine that there was substantial evidence of Ackerman's misconduct, such that no genuine issue of material fact exists, and should grant summary judgment on Ackerman's § 1983 claim on the basis of the same decision defense.

Further, Ackerman's claims that she suffered retaliation after engaging in protected speech is based on nothing more than her own speculation. Her termination occurred months after Ackerman's testimony before the Senate Oversight Committee. (*Compare* SOF ¶ 112-113 *with* SOF ¶ 70). There is no evidence that anyone at IWD instructed human resources staff to "dig up dirt" on Ackerman or to find some other way to get rid of her. Rather, the record shows that Heather Semke, the Human Resources Associate who discovered and elevated the issue with Ackerman's enrollment forms, was alerted to the potential fraud by Ackerman's own odd and nervous behavior during their interactions. (SOF ¶¶ 34-44). Ackerman simply cannot establish a connection between the discovery of her wrongful conduct and her testimony before the Senate Oversight Committee. Her speculation and conjecture are not sufficient to survive Defendants' summary judgment motion.

Finally, even if the Court finds that Ackerman's testimony before the Senate Oversight Committee played any part in the decision to terminate her employment, she should not be

rewarded now with reinstatement when there is substantial evidence in the record that her termination based on the falsification of insurance forms was justified. *Doyle*, 429 U.S. at 285. "If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Ackerman cannot establish but-for causation and this claim must fail.

C. **Ackerman has Failed to Articulate How Each Individual Defendant's Actions Violated Her Right to Free Speech.**

Ackerman's § 1983 claim is barred by the doctrine of qualified immunity. Qualified immunity is a defense available to state officials and employees under 42 U.S.C. § 1983. The doctrine "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Courts have discretion to decide which prongs of the qualified-immunity analysis to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Ackerman asserts her § 1983 claim against all of the individual Defendants. (Fifth Am. Compl. ¶¶ 84-91). However, Ackerman cannot establish that any of the individual Defendants took direct action against her which resulted in the violation of her constitutional rights.

*Defendant Wahlert*

Defendant Wahlert was the director of IWD at the time of Ackerman's Oversight Committee testimony, but was not the director at the time of Ackerman's termination. (SOF ¶¶ 4,

115). There is no evidence in the record that Wahlert directed that Ackerman be fired, disciplined, or that her insurance documents be reviewed. (SOF ¶ 116). The record is entirely devoid of any evidence that Wahlert ever caused Ackerman to be demoted or ordered that her pay be reduced. (SOF ¶ 116).

*Defendant Townsend*

Defendant Townsend was the director at the time of Ackerman's termination and approved of the decision to terminate her, but was not employed by IWD at the time of the Senate Oversight Committee hearings. (SOF ¶¶ 115, 118-126). Indeed, Townsend was largely unaware of the reason for the hearings and the substance of the hearing testimony. (SOF ¶¶ 119-120). Since she was not the subject of Ackerman's complaints during the Oversight Committee hearings, she had no conceivable motivation to fire Ackerman on that basis.

*Defendant Nelson*

While Defendant Nelson was involved in the investigation into Ackerman, he did not discover the falsified documents on his own, nor did he direct his staff to search for them. (SOF ¶¶ 34-44). Heather Semke brought the matter to his attention and he carried out his duty to investigate the issue. Further, Nelson played no part in the Oversight Committee hearing testimony and was not the subject of Ackerman's complaints to the Committee. (SOF ¶ 123).

*Defendants Hillary and Lewis*

Finally, Defendants Hillary and Lewis played absolutely no role in Plaintiff's termination and Ackerman will be unable to show that either woman violated her constitutional right to free speech. (SOF ¶¶ 128-129). Even in their capacity as lead workers, neither Hillary nor Lewis had the authority to discipline Plaintiff or to terminate her employment. (SOF ¶¶ 128-129).

Since Ackerman cannot demonstrate that any of the individually named Defendants violated her constitutional rights, the claims against them must be dismissed under the doctrine of qualified immunity.

## V.    ACKERMAN CANNOT MAINTAIN HER INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AS A MATTER OF LAW

### A.    Ackerman Cannot Establish the Elements of Her Intentional Infliction of Emotional Distress Claim.

Ackerman asserts her intentional infliction of emotional distress claim generally against all Defendants. *See* Fifth Amended Compl., ¶¶ 92-96.  Under Iowa law, Ackerman must establish four elements to prove her intentional infliction of emotional distress claim: (1) outrageous conduct by the defendants; (2) the defendants intentionally caused, or recklessly disregarded the probability of causing, emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendants' outrageous conduct was the actual and proximate cause of the emotional distress. *Hedlund v. State*, 930 N.W.2d 707, 723-24 (Iowa 2019). "[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Id.* at 724, citing *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991). "For conduct to be outrageous, it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Cutler*, 473 N.W.2d at 183 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). Moreover, "[t]he outrageousness element requires *substantial evidence* of extreme conduct." *Vinson*, 360 N.W.2d at 118 (emphasis added). "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* (quoting

Restatement (Second) of Torts § 46 cmt. d). The Iowa Supreme Court has stated that the "outrageous conduct" element "is not easily met, especially in employment cases." *Hedlund*, 930 N.W.2d. at 724, citing *Van Baale v. City of Des Moines*, 550 N.W2d 153, 156 (Iowa 1996), *abrogated on other grounds*, *Godfrey*, 898 N.W.2d at 844; *see also Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990) ("When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable."). Liability has only been found where the conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Though employers have a general duty to refrain from abusive behavior toward employees, the Iowa Supreme Court has often found that "conduct by employers and coworkers did not rise to the level of outrageous conduct." *Hedlund*, 930 N.W.2d at 724, citing *Smith v. Iowa State University of Science and Technology*, 851 N.W.2d 1, 26 (Iowa 2014).

As an initial matter, Ackerman has failed to raise any issue of material fact with respect to the outrageousness of acts committed by individual Defendants Nelson, Hillary, Lewis, and Townsend. During her deposition, Ackerman openly admitted that Defendant Nelson did not engage in outrageous conduct which caused her emotional distress. (Ackerman 129:10-14; App. 43 (Ackerman noting that she doesn't believe Nelson engaged in any infliction of emotional distress "on his own," but that it was at the "direction of Wahlert.")). Nelson's most egregious conduct, according to Ackerman, was questioning her about medical appointments in purported violation of the collective bargaining agreement. (Ackerman 129:10-130:7; App. 43-44). Ackerman goes on to claim that Nelson questioned her with regard to an investigation into an

internal email that was leaked to the press. (Ackerman 129:10-130:7 App. 43-44). Nelson's conduct, as described by Ackerman, is not outrageous as a matter of law.

Similarly, Ackerman fails to describe any conduct by Defendants Hillary or Lewis which rises to the requisite level of outrageousness. When asked in her deposition about Hillary and Lewis's conduct, Ackerman made general allegations of "bullying," but was unable to describe any particular examples in which either Hillary or Lewis engaged in an intentional act meant to inflict emotional distress. (*See* Ackerman 131:4-132:6, 48:5-50:21, App. 44, 23-24 (Ackerman claiming that Hillary "yelled" at her); 50:22-52:7, App. 24 (Hillary and Lewis were "acting like supervisors," sent lots of emails, and refused to assign her the hearing sites she preferred)). In *Vinson v. Linn-Marr Community School District*, the Iowa Supreme Court determined that the defendant's multi-faceted and deliberate campaign to badger and harass the plaintiff did not rise "to the level of extremity essential to support a finding of outrageousness." 360 N.W.2d 108, 119 (Iowa 1984) (collecting cases demonstrating sufficiently outrageous conduct and holding that "[t]he jury could find defendants' actions were petty and wrong, even malicious, but we do not believe a trier of fact could reasonably conclude that the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community." Here, Plaintiff has failed to provide any specifics with relation to Hillary and Lewis's conduct, and even if that conduct could be rightly described as a "campaign to badger," which it cannot, such conduct is not outrageous as a matter of law.

Further, Ackerman claims that Defendant Townsend's decision to refer her fraud case to the Iowa Division of Criminal Investigation was outrageous conduct done for the express purpose of causing her emotional distress. (Ackerman 130:8-22; App. 44). Referral of cases involving criminal conduct by State employees is a typical practice at IWD and is desirable for maintenance

of a properly functioning government. Reporting criminal conduct can hardly be described as "utterly intolerable in a civilized community," and indeed, Plaintiff was charged with fraud as a result of IWD's report. *See Hedlund¸* 930 N.W.2d at 725 (noting that DPS's practice of putting individuals on administrative leave was "typical" and did not rise to the level of outrageous conduct); (SOF ¶ 82). Like Defendant DPS in *Hedlund*, Defendant Townsend complied with the typical policies and practices of the agency, and her conduct was not outrageous as a matter of law.

Finally, Ackerman alleges that IWD, by way of then-director Teresa Wahlert, created a hostile work environment designed to inflict emotional distress. Ackerman's primary complaint against Wahlert is that Wahlert "treated her differently" than other ALJs and "require[ed] [her] to work in the office full time." (Ackerman 37:21-68:6; App. 20-28). Ackerman also complains that at one point, Wahlert pushed back Ackerman's performance evaluation for the purpose of "intimidating" her and influencing her testimony before the Oversight Committee. (Ackerman 44:22-45:3; App. 22). Setting aside the fact that Ackerman worked primarily from home unless she had an in-person hearing for most of her career as an ALJ at IWD, her general hostile work environment claims are insufficient to meet the outrageousness standard. *See generally Hedlund*, 930 N.W.2d at 725 (finding that DPS's decision to send armed officers to plaintiff's home to place him on administrative leave and the repetition of falsehoods against him by coworkers and the Governor were not sufficiently outrageous to state an IIED claim); *Vinson*, 360 N.W.2d at 119 (finding evidence of outrageousness not substantial to sustain jury award for intentional infliction of emotional distress where employer engaged in "a deliberate campaign to badger and harass plaintiff" for questioning the district's seniority policy and breakdown policy which resulted in delaying plaintiff's start time, urging plaintiff to drive in a manner that violated safety standards,

only clocking plaintiff's time, refusing to allow time for clean-up and close down, refusing to allow plaintiff same slack time allotted to other employees, requiring plaintiff to report a theoretical route time, disciplining plaintiff for not reporting the theoretical time route on time card despite other employees reporting actual route time and then accusing plaintiff for falsifying time records even though employer knew plaintiff had not been dishonest, persisting in the falsifying accusation despite knowing plaintiff was reporting the time accurately, refusing to present the issue to the school board despite plaintiff's request, terminating plaintiff for dishonesty, and reporting plaintiff as being dishonest to plaintiff's perspective employer knowing that it would harm her chances of being hired all the while knowing that plaintiff had not acted dishonestly); *Cutler*, 473 N.W.2d at 181 (sending letter delaying decision to permit plaintiff to return to work on a part-time basis, even though cleared by his psychiatrist, after he was under "psychiatric care and hospitalized for a mental condition of such seriousness that he contemplated suicide" resulting in plaintiff's suicide not enough to sustain intentional infliction of emotional distress claim); *see also Chester v. Northwest Iowa Youth Emergency Servs. Ctr.*, 869 F. Supp. 700, 710 (N.D. Iowa 1994) ("In Iowa, the law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." (internal citation and quotation omitted)); *Engstrom v. State*, 461 N.W.2d 309, 320 (Iowa 1990) (negligent failure to search for plaintiffs' adopted daughter's natural father before placing her in plaintiffs' home, and telling adoptive parents the father was dead without verifying his death, were not outrageous); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (banker's refusal to extend credit causing creditor to default on other obligations not sufficiently outrageous to support jury verdict on emotional distress claim).

Moreover, Ackerman does not have sufficient evidence of severe emotional distress. (*See* SOF ¶¶ 130-137). Here, Ackerman describes her emotional distress as feeling humiliated and

discredited, mental anguish, and describes other ill-defined symptoms of depression. (*See* SOF ¶¶ 130-137). Ackerman's alleged distress is not severe emotional distress as a matter of law. *See generally Millington v. Kuba*, 532 N.W.2d 787 (Iowa 1995) (stating headaches, insomnia, loss of appetite and fits of rage insufficient to show required proof of severity), citing *Harsha*, 346 N.W.2d at 801 (stating insufficient severity where plaintiff "wasn't as interested, or . . . was downhearted more or less depressed"); *Poulsen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981) (stating no substantial evidence of emotional distress where plaintiff "was very, very down, feeling super badly, and felt that he [had] lost everything"); *see also Barreca v. Nickolas*, 683 N.W.2d 111, 115 (Iowa 2004) (stating suffering "a great deal of humiliation, embarrassment, stress, and loss of sleep . . . does not amount to severe or extreme emotional distress (internal quotation omitted)), citing *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 71 (Iowa 2002) (stating insufficient emotional distress where plaintiff was unable to work for three days and troubled for six months, and another plaintiff was uncomfortable, tired, hungry, and "a little scared"); *Ollinger v. Bennett*, 556 N.W.2d 167, 173 (Iowa 1997) (stating exacerbation of high blood pressure problem and sleepless nights insufficient); *Bethards v. Shivvers, Inc.*, 355 N.W.2d 39, 44 (Iowa 1984) ("The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.").

In addition to elements one and three, Ackerman, cannot establish the second or fourth elements of an IIED claim. Ackerman cannot present any evidence, other than her conjecture, that Defendants intentionally or recklessly caused her alleged emotional distress, or that Defendants' alleged outrageous conduct was the actual and proximate cause of the alleged emotional distress. Because Ackerman cannot satisfy the elements of her claim as a matter of law, this Court should

grant summary judgment on Ackerman's intentional infliction of emotional distress claim (Count IV).

## VI. ACKERMAN'S FIRST AMENDMENT CLAIMS UNDER THE IOWA CONSTITUTION ARE BARRED.

### A. Ackerman's State Law First Amendment Claim is Barred by the Eleventh Amendment to the U.S. Constitution.

Defendants removed this case to federal court on October 26, 2018. *See* Docket 1. On May 23, 2019, Plaintiff filed her Uncontested Motion for Leave to File her Fifth Amended Complaint. Docket 16. Plaintiff's Fifth Amended Complaint included a novel claim for violation of the First Amendment to the Constitution of the State of Iowa. Docket 16. Defendants now move for summary judgment on Plaintiff's First Amendment claim as barred by the Eleventh Amendment to the U.S. Constitution.

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Pursuant to that Amendment, a private party may not sue a state in federal court unless the state has explicitly waived its sovereign immunity. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) ("While the amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens[.]").

States and "arms" of States "possess immunity from suits authorized by federal law." *N. Ins. Co. of N.Y. v. Chatham Cty. Ga.*, 547 U.S. 189, 193 (2006). Iowa Workforce Development is an agency, or arm, of the State of Iowa. *See* Iowa Code Ch. 84A. The State of Iowa has not waived its Eleventh Amendment immunity with regard to tort claims brought under its constitution.

Indeed, such claims were only recently recognized by the Iowa Supreme Court. *See Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017). Defendants are unaware of any state law case recognizing a constitutional tort for money damages based on a first amendment retaliation claim.

Eleventh Amendment immunity may be waived by a state in two ways. First, a state may explicitly waive its immunity and consent to be sued in federal court. *See Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987). Second, "Congress can abrogate the Eleventh Amendment without the States' consent when it acts," pursuant to § 5 of the Fourteenth Amendment, "'to enforce, by appropriate legislation' the substantive provisions of the Fourteenth Amendment." *Id.* at 474. Neither type of waiver applies here, and Plaintiff's state law First Amendment claim against Defendants must be dismissed in its entirety.

Plaintiff may argue that Defendants consented to be sued in federal court when they removed this action in October of 2018. *See Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 624 (2002) (holding that a state's action in removing a case to federal court constituted a waiver of its Eleventh Amendment immunity). However, this Court should determine that Defendants did not waive their Eleventh Amendment immunity because the novel state-law tort action was added by amendment approximately seven months *after* the removal to federal court. *See* Docket 16, 16-1, and 19. While Defendants consented to Plaintiff's Motion to Amend, that consent did not include a waiver of its sovereign immunity on new claims asserted by Plaintiff. *See Faghri v. University of Connecticut*, No. 3:06-cv-01957, 2010 WL 2232690, at *9-10 (D. Conn. June 3, 2010) (holding that the Defendant University did not waive its Eleventh Amendment immunity upon removal of a case to federal court where Plaintiff later amended to add a novel claim). This court should similarly determine that Defendants are entitled to sovereign immunity

with relation to Plaintiff's novel constitutional tort claim and should dismiss Count VI of Plaintiff's Complaint.

**B.     If Article 1, § 7 of the Iowa Constitution is Self-Executing Such That It Can Sustain a Claim for Damages, the Individual Defendants Are Entitled to Immunity Under *Baldwin's* All Due Care Standard.**

In *Godfrey v. State*, the Iowa Supreme Court held generally that the Iowa Constitution can sustain a damages remedy without prior action by the Iowa legislature. *Godfrey*, 898 N.W.2d 844 (Iowa 2017). The *Godfrey* Court did not establish, however, that Article 1, § 7 of the Iowa Constitution, specifically, is self-executing such that it can sustain a claim for damages. *See generally, id.* In *Baldwin v. City of Estherville*, the Iowa Supreme Court fleshed out the standard to be applied to government officials seeking a grant of immunity for purported violations of Article 1, § 8 of the Iowa Constitution. 915 N.W.2d 259, 279 (Iowa 2018). The *Baldwin* Court determined that the appropriate standard to be applied was one of "all due care." *Id.* A defendant seeking immunity under the new all due care standard must "plead and prove as an affirmative defense that she or he exercised all due care to comply with the law." *Id.* at 280. Defendants aver that if this Court determines that Article 1, § 7 of the Iowa Constitution is self-executing such that it can sustain a claim for damages under a *Godfrey* analysis, the immunity standard set forth in *Baldwin* should apply.

Having properly pled an "all due care" affirmative defense, Defendants now ask the Court to dismiss Plaintiff's Iowa constitutional claim as asserted against the individual Defendants, on the basis that each Defendant exercised all due care to comply with the law of the State of Iowa at all relevant times. *See supra*, section IV (analyzing each individual Defendant's behavior with respect to Plaintiff's federal First Amendment claim).

## CONCLUSION

Based on the authorities and arguments herein, Defendants' Motion for Summary Judgment should be granted in its entirety.

Respectfully submitted,

THOMAS J. MILLER
IOWA ATTORNEY GENERAL

*/s/ Jeffrey C. Peterzalek*
JEFFREY C. PETERZALEK
Assistant Attorney General

*/s/ Kayla Burkhiser Reynolds*
Kayla Burkhiser Reynolds
Assistant Attorneys General

Iowa Department of Justice
Hoover State Office Building, 2nd Floor
1305 E. Walnut Street
Des Moines, Iowa 50319
Ph: (515) 281-4213
Fax: (515) 281-4209
E-mail: Jeffrey.Peterzalek@ag.iowa.gov
E-mail: kayla.burkhiser@ag.iowa.gov
ATTORNEYS FOR DEFENDANTS

All parties served electronically.