# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

SUSAN ACKERMAN,

                     Plaintiff,

vs.

STATE OF IOWA, IOWA
WORKFORCE DEVELOPMENT,
TERESA WAHLERT, TERESA
HILLARY, DEVON LEWIS, BETH
TOWNSEND, and JON NELSON,

                     Defendants.

No. 4:18-cv-363-JAJ-CFB

**OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

In this action, a former administrative law judge (ALJ) for defendant Iowa Workforce Development (IWD) asserts several claims arising from her alleged treatment during the last years of her employment with IWD. In the plaintiff's view, her termination was the last step in the harassment she suffered for opposing attempts by the former director of IWD to turn a fair and impartial administration of unemployment benefits into a process that is biased in favor of employers over employees. In the defendants' view, however, the plaintiff was properly investigated, suspended, then terminated for falsely representing her daughter's marital status in order to obtain insurance coverage for her. This case is before the court on the defendants' February 28, 2020, Motion For Summary Judgment [Dkt. No. 27]. The plaintiff filed her Resistance To Defendants' Motion For Summary Judgment [Dkt. No. 37] on April 3, 2020, and the defendants' filed their Reply [Dkt. No. 40] on April 10, 2020. This case is also before the court on the defendants' April 10, 2020, Motion To Strike Plaintiff's Statement Of Disputed Material Facts [Dkt. No. 41]. The plaintiff filed her Resistance To Defendants' Motion To Strike [Dkt. No. 43] on April 20, 2020. The defendants filed no reply. For the reasons stated below, the defendants' April 10, 2020,

Motion To Strike Plaintiff's Statement Of Disputed Material Facts [Dkt. No. 41] is **DENIED AS MOOT**, and the defendants' February 28, 2020, Motion For Summary Judgment [Dkt. No. 27] is **GRANTED**.

## I.    INTRODUCTION
### A.    Factual Background

The parties' Statements Of Facts in support of and resistance to summary judgment are extensive. Notwithstanding the length of the summary of the factual background that follows, the court has not included all the facts the parties allege, either disputed or undisputed, but only the facts sufficient to put in context the parties' arguments for and against summary judgment. Additional facts, to the extent they are dispositive, are discussed in the court's legal analysis, below. Unless otherwise indicated, the facts stated, here, are undisputed. The court has also, at times, recast the parties' statements of facts to avoid mere characterizations or legal conclusions; to present the facts to the extent they are undisputed; and to present the facts in chronological order.

#### 1.    The parties

Plaintiff Susan Ackerman began her employment with the State of Iowa in 1999 as an ALJ at the women's correctional facility in Mitchellville. Ackerman transferred to defendant IWD in October 2000. IWD is an agency of defendant State of Iowa, organized under and pursuant to IOWA CODE CH. 84A, which was "created to administer the laws of this state relating to unemployment compensation insurance, job placement and training, employment safety, labor standards, and workers' compensation." IOWA CODE § 84A.1(1). Ackerman's duties as an ALJ for IWD included hearing contested cases and deciding whether terminated employees were entitled to unemployment compensation benefits. Ackerman was covered by the collective bargaining agreement between the American Federation of State, County, and Municipal Employees (AFSCME) and the State during

the entirety of her employment with IWD.  Ackerman was terminated from her ALJ position at IWD on January 30, 2015.

Defendant Teresa Wahlert served as the Director of IWD from January of 2011 to early January of 2015.  Defendant Beth Townsend is the current Director of IWD.  She was appointed as Interim Director of IWD in January of 2015 and was confirmed as the Director in March of 2015, after serving for several years as the Director of the Iowa Civil Rights Commission.  Defendants Teresa Hillary and Devon Lewis were both ALJs with IWD at pertinent times.  Lewis retired from IWD in July of 2018, and Hillary retired from IWD in August of 2019.  Defendant Jon Nelson served as the Human Resources Supervisor for IWD from 2007 to 2015.

### 2.      *Friction in IWD*

The parties agree that, throughout the course of Wahlert's tenure as Director of IWD, various individuals complained about her leadership.  Ackerman contends that Wahlert interfered with IWD's work by attempting to turn a fair and impartial administration of unemployment benefits into a process that is biased in favor of employers.  While admitting that there were complaints about Wahlert's leadership, the defendants contend that there is no evidence that Wahlert interfered with the fair and impartial work of IWD.

Ackerman contends that Wahlert, Hillary, and Lewis harassed her and other ALJs in a number of ways, including in evaluations.  Ackerman received a "meets or exceeds expectations" at her first formal evaluation in 2002, and from 2003 through 2010, she received seven "exceeds expectations" evaluations and only one "meets expectations" in annual reviews.  On the other hand, in Ackerman's next formal review in 2013, Wahlert's first evaluation of Ackerman, Wahlert rated Ackerman as not meeting expectations in two areas, provided no rating in six other areas, and no overall rating.  Wahlert had initially sought to schedule Ackerman's next annual review in late August 2014, but Ackerman and other ALJs were issued subpoenas to testify before an Iowa Senate committee, and, as a

result, Wahlert's office postponed the review until sometime after the committee hearing. Ackerman contends that, when Wahlert eventually signed Ackerman's performance evaluation on November 19, 2014, after Ackerman gave testimony critical of Wahlert at the Iowa Senate committee hearing, Wahlert initially gave her an overall rating of "does not meet expectations," which would have been Ackerman's first negative evaluation in her 14 years with IWD, but Wahlert crossed out this initial overall rating and changed it to "meets expectations." The evaluation form shows that the "does not meet expectations" box for the "Overall Rating" was marked then scratched out. Pl.'s App. at 145. The defendants point out that the resulting evaluation was "meets expectations."

The parties agree that, at some point late in 2013, Wahlert directed all ALJs to begin working in the office rather than from home. Prior to that, for most of Ackerman's tenure with IWD, Ackerman worked out of her home office, because 90% of IWD appeal hearings are conducted telephonically. After the directive that ALJs work from the office, Ackerman went on FMLA leave on December 3, 2013. Ackerman's application indicates that the reason for the FMLA leave was worsening depression due to job-related stress. Ackerman also filed a grievance about working in the IWD office full-time, which was denied. The ALJs worked in the office full-time for a period of time and then subsequently rotated between their homes and the office. Ackerman alleges that Wahlert told her that she could pick her own schedule, but Lewis told her she had to fit into the rotation.

Wahlert also questioned Ackerman on February 28, 2014, about her sick leave requests, and Wahlert asked Nelson to follow up with Ackerman and other IWD employees regarding taking sick leave in compliance with the collective bargaining agreement. Ackerman took additional FMLA leave in March or 2014. Ackerman asserts that Wahlert further directed Nelson to question Ackerman about medical appointments scheduled for April 9, 2014, and to demand medical excuses for these appointments while other employees requesting the same amount of time were not required to obtain medical excuses. The defendants admit that Wahlert asked Nelson to follow up with Ackerman

and other IWD employees regarding taking sick leave, but only to remind them to take leave in compliance with the collective bargaining agreement. Ackerman again took FMLA leave from July 9, 2014, through August 4, 2014, which Ackerman alleges was due to anxiety and depression resulting from deteriorating work conditions, although her application does not identify a specific reason other than "Medical Leave (Employee's serious health condition)." Pl.'s App. at 234.

Wahlert appointed Hillary and Lewis as "lead workers" at some point in 2013. On August 16, 2013, Ackerman wrote to Wahlert, copying the other ALJs, complaining of the hostile work environment that Hillary and Lewis created. Wahlert responded twice, first stating Ackerman had nothing to worry about, but then writing that "[i]f you believe we have a hostile environment – that would be your home office. Maybe you should consider working in the office full time?!" Pl.'s App. at 130, 134. Ackerman also asserts that Wahlert appointed Hillary as a "lead worker," even though Walsh had settled a prior grievance about Hillary's abusive conduct toward other ALJs by barring her from lead work for a year. Wahlert testified that she did not know about the previous grievance settlement, because there was nothing about it in the personnel files. Defs.' App. at 124. On November 7, 2014, an arbitrator sustained a union grievance about Hillary's appointment and upheld the prior grievance resolution, holding that "Ms. Hillary should be barred from lead work or management functions for a year." Pl.'s App. at 159.

In August of 2014, the Iowa Senate Government Oversight Committee initiated hearings related to complaints it had received about IWD leadership. Five ALJs were subpoenaed to testify before the Oversight Committee: Ackerman, Hillary, Lewis, Marlon Mormann, and Bonnie Hendricksmeyer. The parties agree that, prior to the Senate hearings in August 2014, Ackerman and other ALJs met with Senator Dotzler. Ackerman contends that the meeting was to discuss how Wahlert's position in IWD, as a political appointee, had the appearance of impropriety and took away the appeals bureau's judicial independence.

5

Ackerman, Mormann, and Hendricksmeyer testified on August 26, 2014, about her dissatisfaction with Wahlert's leadership.  More specifically, they testified about how the political interference was affecting their judicial independence and how Wahlert, Lewis, and Hillary had created a hostile environment at the appeals bureau.  The defendants admit that such testimony was given, but they deny that there is any evidence in the record to support that testimony.  Henricksmeyer had already left IWD by August 2014.  She submitted a sworn statement in this case, which stated, "I had no choice to leave my position as an ALJ [on May 31, 2014] because of the ongoing hostile work environment which Teresa Wahlert, Devon Lewis, and Teresa Hillary created at Iowa Workforce Development."  Pl.'s App. at 336.  Mormann submitted his resignation and filed a lawsuit including "a constructive discharge claim . . . related to his departure from IWD on January 5, 2015."  *Mormann v. Iowa Workforce Dev*., 913 N.W.2d 554, 557 (Iowa 2018).

Hillary and Lewis testified in support of Wahlert and denied that there was pressure to rule in favor of employers.  During her testimony, Lewis denied that she had ever tape-recorded co-workers, unless they were involved in a hearing with her.  Lewis had emailed Wahlert in October 2013, however, saying that she had made a recording of a conversation between herself and Mr. Mormann.  Wahlert testified that, shortly after Lewis's testimony at the Oversight Hearing, "Ms. Lewis came up to me and mentioned that she believed she had misspoke[n] and wanted to know if she could get recalled so she could clarify the record on the taping incident. . . .  And I told her that I would clarify that record the next day when I was testifying."  Pl.'s App. at 63.  Lewis claimed to Wahlert that her false statement under oath was an innocent oversight.  IWD did not take any disciplinary action against Lewis, suspend or terminate her, or report her for ethical or criminal violations.

Mr. Mormann, however, filed an ethics complaint against Lewis based on her misrepresentations and her recording a co-worker.  The Iowa Supreme Court Attorney Disciplinary Board concluded, as follows:

> Given [Lewis's] denial [that she knew her testimony was false], knowledge (or absence of knowledge) must be inferred from the circumstances.  Even viewing the matter in the light most favorable to [Lewis], the Board concluded that if respondent did not knowingly testify falsely, she at least recklessly misrepresented the truth without carefully searching her memory.
>
> It was the determination of the Board to admonish respondent for making a reckless misrepresentation to the senate committee, in violation of Iowa R. Prof'l Conduct 32:8.4(c).  This concludes the Board's investigation of [Mr. Mormann's] Complaint.

Pl.'s App. at 88.

The night after the ALJs testified to the Oversight Committee, Wahlert and Lewis gathered information regarding ALJs and the appeals bureau for use at the Oversight Committee hearing.  Ackerman alleges that the purpose of doing so was to gather information against the ALJs.  This information included Lewis's evaluation of an Ackerman case, in which Lewis gave Ackerman an 89% score, based on the total of points awarded in various categories of "quality review" and failed Ackerman on her evaluation of the "due process" she had afforded the hearing parties.  Pl.'s App. at 105-08.  The parties appear to dispute whether the DOL scored Ackerman as a "fail" or whether the DOL only provided the forms, but the scoring was done by IWD employees.  The parties also appear to dispute whether a "failing" score was below 90% or below 85%.  The information gathered for Wahlert's use also included the reversal rate records for the ALJs, including Ackerman.

Wahlert testified before the Oversight Committee on August 27, 2014.  Among other matters addressed in her testimony, Senator McCoy asked about findings in an appeal process after a case decided by Hillary "that [Hillary] was disruptive, difficult, cut people off, curt, and—and quite frankly, they—they thought that a fair hearing did not happen."  Pl.'s App. at 244.  Senator McCoy was concerned about why Wahlert was holding up Hillary as a lead worker and giving her a salary increase.  Wahlert responded as follows:

TERESA WAHLERT: Well, I'd like to give a little context to that, if I may.

SENATOR MATT McCOY: I'd love to have some.

TERESA WAHLERT: In the last couple months, we have had over 90 remands, modifications and—from the employment appeal board.

Every single judge has them. For fairness, Senator, if you'd like me to bring the dirt on all the judges, I'm happy to do that.

I'm happy to give you what the comments are about Bonny Hendrickson—Hendricksmeyer had, that Marlon Mormann had, that Susan Ackerman had, that any of the judges had. It's public information.

SENATOR MATT McCOY: Sure.

TERESA WAHLERT: And they're—many of them are similar to the one—the only one you decided to read.

I might also bring up that Susan Ackerman, who was over here in distress, has a finding from the U.S. Department of Labor on attitude, bias, and prejudice and flunked a DOL review of one of her cases eight months ago and three months ago again did not pass a Department of Labor review of one of her cases because she did not give due process to—to the people involved in the case.

So I think singling out any one judge is probably inappropriate. I think they all have bad days, just like you have bad days and I have bad days.

So I don't think that my appointment of any one of those people as a lead worker is (unintelligible). It's not long term. They all know it's a short-term thing.

If you look up what a lead worker is, it is a short-term thing. I pay them extra because they work extra. That's why I pay them extra.

Pl.'s App. at 244.

The Senate Government Oversight Committee eventually issued Findings and Recommendations, which stated in pertinent part, as follows:

8

7)   Take political influence out of the judicial process

FINDING:  The U.S. Department of Labor (DOL) had to intervene when Iowa Workforce Development Director tried to reclassify a merit judicial position to an at-will position.  The DOL noted this violated established principles that say judges must be insulated from political influence.

FINDING:  The Iowa Workforce Development Director, a political appointee, is currently the direct supervisor of the unemployment appeals Administrative Law Judges.

FINDING:  The former Public Employment Relations Board chair testified that Governor Branstad's office pressured the Board to hire an unnamed administrative law judge.

RECOMMENDATION:  Review existing Iowa law regarding the adjudicative process to ensure Iowans receive a fair and impartial hearing.

RECOMMENDATION:  Prohibit all political appointees and/or an at-will employees [sic] from supervising or evaluating administrative law judges to preserve their integrity and independence in decision making.

Pl.'s App. at 123.

Ackerman was again on FMLA leave from September 11, 2014, through October 22, 2014.

### 3.   *Ackerman's insurance coverage for her daughter*

Ackerman contends that retaliation against her for her hearing testimony also included an investigation of alleged wrongdoing in seeking insurance coverage for one of her daughters.  Ackerman has two adult daughters, C.B. and J.K., and an adult son, R.K. C.B. married in 2009 and resided in Hawaii with her husband until their separation in 2012. After separating from her husband, C.B. moved to and attended school in Minnesota, but she did not pursue a divorce at that time.

In 2012, a State employee could secure health insurance benefits for the following calendar year (2013) for an adult child over the age of 26, as long as the child was a full-

time student and unmarried.   In November 2012, C.B. was 27 years old, married, but separated from her husband.   In the fall of 2012, Ackerman contacted Monica Reynolds in the human resources department at IWD to inquire about enrolling C.B. in Ackerman's health insurance plan for the 2013 calendar year.   Ackerman knew Ms. Reynolds from Ackerman's prior job at Mitchellville, where Ms. Reynolds had previously been a human resources associate.   Ms. Reynolds had also transferred to IWD in 2010.   Ackerman contacted Ms. Reynolds with her benefits questions, even though her assigned Human Resources Associate (HRA) was Vicki Sandy.

The parties agree that, on November 1, 2012, Ackerman and Ms. Reynolds had an email exchange, the substance of which was the following:

> Ackerman: Hey, I've looked at the web site for the dependent tax consequences and it seems that I can only get coverage for [C.B.] if she is unmarried???
>
> Reynolds: I thought [C.B.] was unmarried??
>
> Ackerman: No, her husband is still in Hawaii but will probably be moving back here next year.
>
> Reynolds: Who has to know she is married?

Defs.' App. at 237-40.  C.B. was enrolled on the State of Iowa's insurance plan for calendar year 2013 and received insurance benefits throughout that year.

The same requirements for coverage of an unmarried child applied for 2014, and in November of 2013, C.B. was 28 years old and married.   In the fall of 2013, Ackerman completed a form called "Certification of Full Time Student Status," which included the following policy statement:   "You may enroll your unmarried full-time student on your insurance plan."   It also included a box in which the person applying for benefits had to attest to whether the adult child was married.   In completing the Certification of Full Time Student Status form, Ackerman checked the "no" box, indicating that C.B. was not married, despite knowing that C.B. was still married.   Ackerman asserts that she did so with the

guidance of and authorization from IWD Human Resources, specifically, Ms. Reynolds. Ackerman also signed the form underneath the following certification statement:

> I am providing this information to my employer for Insurance enrollment and tax reporting purposes. By signing and returning this form, I certify that all of the statements above are true. I understand that my employer will rely on this information to calculate the taxability of coverage provided to my full-time student over age 26. In addition, I certify that this full-time student is unmarried. In my fulltime student's status changes, I will notify my employer immediately by submitting that information, in writing, to my Personnel Assistant.

Defs.' App. at 210. C.B. was again enrolled on the State of Iowa's insurance plan for calendar year 2014 and received insurance benefits through December of 2014. In contrast, Ackerman's son, R.K., got married in 2009, and was subsequently a full-time student. In 2013, when R.K. turned 27, Ackerman understood that he was disqualified as a dependent on Ackerman's health insurance.

In 2014, Ackerman began the process to re-enroll C.B. for health insurance coverage for calendar year 2015. On November 24, 2014, as part of the benefits enrollment process, Ackerman emailed the Full-Time Student and Verification Forms listing C.B. as a dependent beneficiary to a different Human Resource Associate for IWD, Heather Semke. Ms. Semke never had any interactions with Ms. Reynolds while she worked for IWD and no significant interactions with Ackerman prior to the events at issue in this case. Later that day, Ackerman called Ms. Semke to let her know that C.B. had divorced and to explain that the divorce was the reason why C.B.'s last name was different on the form than it was on the paperwork C.B. had provided from her university regarding her student status. Ms. Semke was concerned that Ackerman was not properly seeking insurance coverage for her daughter.

### 4.    *Ackerman's suspension*

Ms. Semke testified that she would have brought the matter to the attention of Nelson, as her supervisor, prior to December 17, 2014, and Nelson testified that Ms. Semke

11

reported the issue to him in November 2014.  After listening to Ms. Semke's concerns, Nelson contacted Ed Holland, then-Risk and Benefits Manager with DAS, to gather documentation relating to Ackerman's previous health insurance enrollments and to inform him of the situation.  On November 25, 2014, Mr. Holland responded by email to Nelson, stating the following:

> Just a status report on the Ackerman situation.  The whole situation hinges on the fact Ms. Ackerman claims the fact her daughter was living apart from the husband meant the daughter was unmarried.  Of course this is not accurate and I assume any attorney would know this was the case, because of this, discipline may be in order.  I have reviewed her email about what Monica told her and I do not believe that helps her case as Ms. Ackerman states Monica told her the daughter had to be unmarried.

Defs.' App. at 215 (emphasis in the original).  Mr. Holland apparently indicated to Nelson that DAS had been unable to locate paperwork for 2012, but Ackerman admits that she believes she would have completed a certification in 2012.

After gathering additional documentation, IWD decided to suspend Ackerman with pay pending an investigation into her decision to enroll her married adult daughter in her State insurance plan.  Nelson testified that he was directed to suspend Ackerman on December 11, 2014, by whoever was in charge of Ackerman at the time, which he believed was either Mr. Slater or Wahlert.  Mr. Slater did not begin as division administrator of unemployment insurance appeals until December 15, 2014, however.  Ackerman met with Nelson and Paul Mikkelson, then-Chief Financial Officer for IWD and Nelson's direct supervisor, on December 11, 2014, and was informed that she would be suspended, with pay, pending an investigation into her conduct.  During the December 11, 2014 meeting, Ackerman stated that she "was only doing what her HR Specialist Monica Reynolds told her to do."  Ackerman also reiterated her contention that her daughter "was not married because she was separated from her husband and that [C.B. and her former husband] never lived as husband and wife after the separation."

### 5.    *Subsequent investigation*

On December 12, 2014, Nelson interviewed Ackerman in the presence of Greg Lewis, the union representative, and Paul Mikkelsen.  Ackerman contends that Nelson refused the union's request to postpone the interview until Ackerman's union steward, Stan McElderry, could be present.  During the course of the first interview, Ackerman again reiterated her claims that her daughter's marriage had ended once she and her former husband were living in separate households and that she had "listed [C.B.] as a full-time student and not married" with "Monica's full knowledge."

On December 31, 2014, Nelson spoke with Ms. Reynolds by telephone.  Ackerman admits that Ms. Reynolds told Nelson that she told Ackerman to contact Wellmark regarding her daughter's situation, and Ackerman contends that Wellmark told her that it was "the HR department that determined eligibility."  Ms. Reynolds also told Nelson that she had discussed the issue with Rose Baughman, a former DAS employee, who had indicated that Ackerman was permitted to enroll her daughter in the State's plan.

On January 7, 2015, Nelson interviewed Rose Baughman, regarding her interactions with Ms. Reynolds.  Ackerman admits that Ms. Baughman told Nelson that she believed there was no question or uncertainty about the term "unmarried" for insurance enrollment purposes.  Nelson testified that Ms. Baughman told him a person who was engaged in divorce proceedings would not be eligible for enrollment on the State's health insurance plan until proof of a divorce decree had been provided and that, while she did not recall speaking with Ms. Reynolds about the issue, that was the advice Ms. Baughman would have provided to Ms. Reynolds.  Ackerman points out, however, that Ms. Reynolds has submitted an affidavit stating that she did speak with Ms. Baughman and that Ms. Baughman told her that it was fine for Ackerman to add her daughter to Ackerman's health insurance coverage under the circumstances.

On January 22, 2015, Nelson interviewed Ackerman for a second time in the presence of Mr. Slater and Stan McElderry, the acting union steward.  During the January

22, 2015, interview, Ackerman again reiterated that she had relied on the advice given to her by Ms. Reynolds in completing the Certification of Full Time Student Status form.

A third interview was held on January 28, 2015, which Ackerman contends was at the direction of Townsend, in the presence of Mr. Slater and Mr. McElderry.  At that interview, Ackerman indicated that she "knew that if [C.B.] was living together and married in the same household married, no she could not be added [to the State's health insurance plan]."  When asked whether her daughter was married or unmarried, Ackerman stated, "I didn't consider that she was in a married relationship" and "she was not divorced but I did not consider her married."  Ackerman acknowledged that C.B.'s divorce had not been finalized until "May or June of 2014."  The record reflects that the divorce decree was entered on July 24, 2014.

### 6. *Ackerman's termination*

During a meeting on January 30, 2015, Ackerman was issued a termination letter signed by Unemployment Insurance Appeals Division Administrator Stephen Slater. Ackerman was read her *Loudermill* rights,[1] and she indicated that she did not have any additional mitigating facts that would suggest that she did not fully understand IWD's policies at the time she completed the insurance forms.

In pertinent part, the termination letter states,

> This letter is to inform you that effective 1/30/15, you are being terminated from employment with Iowa Workforce Development (IWD).  This action is being taken because our investigation determined that you submitted paperwork in 2013 to the Department of Administrative Services requesting to maintain your adult married daughter on your health insurance; the paperwork contained false statements by you.  It

---

[1] "In *[Cleveland Bd. of Educ. v.] Loudermill*, the [United States Supreme] Court reaffirmed that the Due Process Clause requires 'some form of pretermination hearing' prior to an employee's discharge."  *Nagel v. City of Jamestown, N. Dakota*, 952 F.3d 923, 932 (8th Cir. 2020) (quoting *Loudermill*, 470 U.S. 532, 542 (1985)).

> has been determined by management that you fraudulently
> filed the forms indicating your daughter was unmarried when
> in fact she was still married under the law.  You signed the
> forms certifying that all statements were true when they were
> not.  Your claim that you received approval from the IWD
> Human Resource Associate to add your married daughter does
> not absolve you from assuring that the information you submit
> and sign is certified to be true.

Defs.' App. at 257.  The letter then identifies IWD Work Rules, a provision of the State of

Iowa Employee Handbook Rules, and Iowa Rule of Professional Conduct 32:8.4(c) as rules

violated by Ackerman's conduct.  *Id.*  The letter continues,

> It is IWD management's conclusion that your impropriety in
> this matter would have a negative consequence for IWD in
> working with clients, employers and the public.  It calls in to
> question your integrity and ability to impartially perform your
> duties as an administrative law judge.

Defs.' App. at 257.  After an intervening paragraph, concerning procedures to vacate her

office and return bureau materials, the letter concludes, "You may file a grievance per

Article IV of the AFCSME collective bargaining agreement if you feel this action was not

taken for just cause."  Defs.' App. at 258.  Ackerman admits that the reasons stated in the

letter were "[t]he reasons [IWD] relied upon," but she disputes that they are the real

reasons.

Ackerman claims that she was suspended and ultimately terminated because of her

testimony before the Oversight Committee.  It is undisputed that Wahlert was no longer

the Director of IWD at the time of Ackerman's termination, was not involved in the

decision to terminate Ackerman, and was not even aware that Ackerman had been

terminated until after the fact.  Defendants Hillary and Lewis, who had been appointed lead

workers during the summer of 2013, had no authority to discipline or terminate Ackerman.

In an affidavit, Mr. Slater averred that Ackerman "was terminated from IWD in January

2015 at the direction of IWD Manager Jon Nelson and then-acting director of IWD, Beth

Townsend."  Pl.'s App. at 339.

Prior to her appointment as Interim Director of IWD, Townsend was not acquainted with Ackerman.  Townsend was briefed on the nature of the allegations against Ackerman when Townsend started in her role as Interim Director of IWD.  In January of 2015, after she became Interim Director, Townsend was vaguely aware of the Oversight Committee hearings, but did not know "when they were or what they were the subject of [sic]."  Townsend became aware that Ackerman and other ALJs testified before the Oversight Committee.  Townsend testified that she never had any conversations about Ackerman with Wahlert.  Ackerman admits that Townsend was not the subject of Ackerman's criticisms, but IWD, where Townsend had just been installed as interim director, was the subject of Ackerman's criticism.  Ackerman also admits that Townsend testified that she only became aware that Ackerman had testified before the Oversight Committee after being told by her staff that Ackerman alleged that the investigation into her conduct related to her insurance coverage for her daughter had been initiated because of her testimony.  Townsend testified that the staff who briefed her were Steve Slater, former Director of the Unemployment Insurance Appeals Bureau at IWD, and Nelson, although Ackerman contends that IWD's counsel, Nicholas Olivencia, was also present at the meeting.  Slater was new in his role with IWD, because he had started in December of 2014, and was not employed by IWD at the time of the Oversight Committee hearings.  Nelson, who was the only individual involved in conversations about Ackerman's termination who was employed by IWD at the time of the Oversight Committee hearings, testified that he was not involved with the hearings and did not have any discussions with any staff member about the hearings.

Townsend testified,

> [A]s as I understood it—again, I don't recall exactly how many ALJs had testified in front of the oversight commission, and none of them were under investigation or disciplinary action. So I did not believe that this [investigation of Ackerman] was a product of any type of retaliation.
>
> * * *

> I was satisfied that the allegations of misconduct against Ms. Ackerman were serious enough to clearly be the reason for what was happening to her.
>
> Again, none of the other ALJs who had testified were facing any type of disciplinary action nor were they being investigated.
>
> So I drew the conclusion that this did not have anything to do with Ms. Ackerman's testimony.

Defs.' App. 52-53.

### 7.   *Criminal, grievance, and attorney disciplinary proceedings*

On February 4, 2015, Nelson provided information relating to Ackerman's conduct to Iowa Division of Criminal Investigation (DCI) Special Agent Matthew Clifton. Ackerman contends that Nelson did so at Townsend's direction.   Eventually, the Polk County Attorney's Office charged Ackerman with one count of insurance fraud, a class D felony.   In a Ruling On Defendant's Motion To Dismiss, filed June 6, 2017, the court granted Ackerman's motion and dismissed the trial information on statute of limitations grounds.   Defs.' App. at 5.   Specifically, the court concluded as follows:

> [T]he State should have filed its trial information herein no later than November 15, 2016, and, because it failed to do so, it is in violation of Iowa Code Section 802.3. Therefore, defendant's motion to dismiss must be and hereby is **GRANTED** and the trial information is hereby **DISMISSED WITH PREJUDICE** with costs taxed to the State.

Defs.' App. at 9 (emphasis in the original).   The district court stated, "The court concludes that defendant was subjected to retaliatory, selective, and/or vindictive treatment by the State including, but not limited to, the instant criminal prosecution and the underlying criminal investigation."   Defs.' App. at 7.   This conclusion is undoubtedly dicta, however, because the court added, "[B]ecause of its findings and conclusions herein relating to the defendant's other basis for her motion to dismiss, namely, statute of limitations, *the court need not and therefore does not base its ruling herein on the aforementioned findings and conclusions*."   *Id.* (emphasis added).   It also unclear whether the "vindictive treatment by

the State" to which the court referred is the investigation by the DCI and the prosecution by the Polk County Attorney, conduct by officials or employees of IWD, or both.

On February 11, 2015, Ackerman's union steward submitted a grievance on Ackerman's behalf regarding her termination. Because Ackerman's grievance involved a termination, it skipped the "first step" and went directly to the "second step" of the grievance process. On June 15, 2015, the Department of Administrative Services (DAS) conducted its own assessment of the investigation and determined that the termination was justified. Defs.' App. at 201-07. Ackerman contends, however, that the union apparently did not submit any evidence that Ackerman had provided testimony to the Oversight Committee. Ackerman requested further review, and an arbitrator heard Ackerman's grievance on December 8, 2015. The arbitrator held that IWD had just and proper cause to terminate Ackerman and that the degree of discipline was appropriate. *Id.* at 266. AFSMCE filed an Application to Vacate an Arbitration Award in Iowa District Court concerning the arbitrator's decision. In an Order issued January 10, 2017, the court denied and dismissed AFSCME's motion. *Id.* at 295.[2]

On February 13, 2015, IWD referred information relating to Ackerman's conduct to the Iowa Supreme Court Attorney Disciplinary Board. On July 8, 2015, the Attorney Disciplinary Board issued a decision that a majority of the Board had concluded that Ackerman's false certification "did not amount to an ethical violation, and dismissed the complaint." *Id.* at 300. The Board added, "Nonetheless, the false certification was troubling and the Board strongly cautioned respondent against any future, similar conduct." *Id.*

---

[2] Unlike the district court's conclusion, in dicta, that Ackerman suffered "vindictive" treatment, in the order dismissing the criminal prosecution against her on statute of limitations grounds, this conclusion of the district court on Ackerman's grievance may have preclusive effect. *See, e.g., Haberer v. Woodbury Cty.*, 188 F.3d 957, 961-64 (8th Cir. 1999). The defendants do not assert such any such issue preclusion, here, however.

### 8.    *Ackerman's allegations of emotional distress*

Ackerman was first treated for depression symptoms in 1992.  Although her depression and anxiety symptoms have been well-controlled at times, she has been prescribed medication for depression and anxiety over the course of many years. Ackerman alleges, however, that starting with the hostile work environment she claims was created by Wahlert, Lewis, and Hillary, her condition worsened and reached a point where she had to take FMLA leave.  She suffered from active anxiety symptoms including upset stomach, "high emotions," crying, and worry while Wahlert was her direct supervisor.

Ackerman contends that her symptoms worsened after termination, being reported for ethical violations, and being referred to the Iowa Division of Criminal Investigation for criminal investigation.  Ackerman has been treated for anxiety and depression by Elaine Hoversten, PsyD, most recently in January of 2015.  Ackerman also contacted Lawyers Helping Lawyers and saw a counselor through them.  Ackerman states that she continues to work with this group every week, attending meetings to address her depression and feelings of worthlessness.  Ackerman still suffers from depression and the parties dispute the extent to which her symptoms have subsided, affected her ability to function, and affected her family life.

### B.    *Procedural Background*

Ackerman filed her original Petition At Law in this action in the Iowa District Court for Polk County on January 13, 2015.  The defendants eventually removed this action to this federal court on October 26, 2018, asserting federal question jurisdiction based on Ackerman's addition of a claim for alleged violations of the First Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, in her Fourth Amended Petition, filed September 28, 2018.  The controlling pleading, however, is Ackerman's Fifth Amended Complaint, filed in this court on May 30, 2019, and naming as defendants the State Of

Iowa, IWD, Teresa Wahlert, Teresa Hillary, Devon Lewis, Beth Townsend, and Jon Nelson.

Somewhat more specifically, in Count I of her Fifth Amended Complaint, Ackerman asserts a "whistleblower retaliation" claim against defendants IWD, the State, Wahlert, and Townsend for violations of IOWA CODE § 70A.28; in Count II, Ackerman asserts a defamation claim against Wahlert; in Count III, Ackerman asserts a claim of violation of her rights under the First Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, apparently against all the individual defendants in their personal capacities; in Count IV, Ackerman asserts a claim for intentional infliction of emotional distress apparently against all defendants; in Count V, Ackerman alleges discharge in violation of public policy, apparently against all defendants; and in Count VI, Ackerman added a new claim of violation of her right to free speech protected by article I, § 7 of the Iowa Constitution against the individual defendants.  The defendants filed their joint Answer To Plaintiff's Fifth Amended Complaint on June 11, 2019.  In their Answer, the defendants deny Ackerman's claims and assert various affirmative defenses.

After discovery, the motions now before the court followed in due course in February and March of this year.

## II.    THE MOTION TO STRIKE

The court will first consider the defendants' Motion To Strike, because that motion relates to what record the court can consider on the defendants' Motion For Summary Judgment.  The defendants move the court to strike Ackerman's April 3, 2020, affidavit submitted at pages 346-352 of her appendix, as well as her Statement of Disputed Material Facts numbers 8, 9, 12, 15, 16, 18, 27, 51, 52, 55, 57, 78, and 79.

The defendants contend that the affidavit should be stricken in its entirety, because it is self-serving and, aside from containing unsupported allegations relating to the employment of various of her colleagues, of which Ackerman certainly has no personal

knowledge, it provides information that Ackerman failed to disclose at the time of her deposition relating to her employment search and emotional distress damages.  In response, Ackerman argues that nothing in her affidavit is inconsistent with her deposition testimony.  Instead, she contends that it elaborates and clarifies matters addressed in her deposition.

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides as follows:

> **(4)** *Affidavits or Declarations***.**   An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 54(c)(4).  It is true that "'a party cannot defeat summary judgment by submitting an affidavit or declaration contradicting his or her earlier deposition testimony[.]'"  *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 886 n.3 (8th Cir. 2016) (quoting *Lykken v. Brady*, 622 F.3d 925, 933 (8th Cir. 2010)); *Taylor v. Cottrell, Inc*., 795 F.3d 813, 818 (8th Cir. 2015) (same, citing *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498 (8th Cir. 2008), and *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)).  On the other hand, "an affidavit may be submitted to clarify ambiguities or confusion in deposition testimony."  *Taylor*, 795 F.3d at 818 (citing *City of St. Joseph, Mo. v. Sw. Bell Tel*., 439 F.3d 468, 476 (8th Cir. 2006)).  The affiant must provide an explanation for the inconsistencies with prior deposition testimony, however.  *Stewart v. Rise, Inc.*, 791 F.3d 849, 861 (8th Cir. 2015).

The court declines the defendants' invitation to exclude Ackerman's April 3, 2020, affidavit in part or in its entirety.  Rather, the court simply will not consider any portion of an affidavit that contradicts prior testimony, without explanation, *see Garrison*, 833 F.3d at 885 n.3; *Stewart*, 791 F.3d at 861, or would otherwise be inadmissible, *see* FED. R. CIV. P. 54(c)(4).  Consequently, the defendants' Motion To Strike is **denied as moot** as to Ackerman's April 3, 2020, affidavit.

As to the challenged statements of facts, the defendants contend that they are not supported by the evidence in the record other than Ackerman's self-serving statements in

her challenged affidavit or are not supported by the parts of the record Ackerman cites. Ackerman responds that the challenged statements are properly supported by her affidavit or other parts of the record.

A district court has the discretion to strike statements of fact offered in support of summary judgment for reasons including "(1) failing to cite to the record, (2) lacking the support of admissible evidence at trial, or (3) containing statements that were not properly supported by the material cited or that were otherwise irrelevant or immaterial." *Kirklin v. Joshen Paper & Packaging of Arkansas Co*., 911 F.3d 530, 533 (8th Cir. 2018). The district court also has discretion to strike statements of fact that do not comply with local rules or the Federal Rules of Civil Procedure. *Brannon v. Luco Mop Co*., 521 F.3d 843, 847 (8th Cir. 2008).

Again, the court declines the defendants' invitation to strike the challenged statements of fact paragraph-by-paragraph. Rather, the court will simply not consider statements of facts that the court finds are deficient. Consequently, the defendants' Motion To Strike is **denied as moot** as to the challenged paragraphs of Ackerman's Statement of Facts.

## III.    THE MOTION FOR SUMMARY JUDGMENT

The defendants seek summary judgment on all six of Ackerman's claims. Ackerman argues that summary judgment should be denied as to all but one of her claims. The court will consider each of Ackerman's claims, in turn. First, however, the court will summarize the standards for summary judgment.

### A.    Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). It provides,

further, that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As the Eighth Circuit Court of Appeals recently explained,

> "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019).

More specifically, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 510 (8th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Once the parties have met their burdens, the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Torgerson*, 643 F.3d at 1042-43 (internal quotation marks and citations omitted). Also, "'[w]here . . . the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015) (quoting *In re Cochrane*, 124 F.3d 978, 981-82 (8th Cir. 1997)).

### B.      Ackerman's Claims

### 1.      The whistleblower retaliation claim

In Count I of her Fifth Amended Complaint, Ackerman asserts a whistleblower retaliation claim against defendants IWD, the State, Wahlert, and Townsend for violations of IOWA CODE § 70A.28.  Ackerman alleges that the violations include the wrongful and retaliatory negative evaluation, her suspension, and her termination.  She alleges that these actions were undertaken, in substantial part, as a reprisal against her for her disclosure of information to public officials, specifically, her testimony to the Oversight Committee, about Wahlert, Hillary, and Lewis that showed a violation of law or rule, mismanagement, a gross abuse of funds, and/or an abuse of authority.  The defendants assert that they are entitled to summary judgment on this claim on several grounds.

### a.      Governing law

IOWA CODE § 70A.28 provides, in pertinent part, as follows:

> 2. *A person shall not discharge an employee from or take or fail to take action regarding* an employee's appointment or proposed appointment to, promotion or proposed promotion to, or *any advantage in, a position in a state employment system administered by, or subject to approval of, a state agency as a reprisal* for a failure by that employee to inform the person that the employee made a disclosure of information permitted by this section, or *for a disclosure of any information by that employee to a member or employee of the general assembly, a disclosure of information to the office of ombudsman, a disclosure of information to a person providing human resource management for the state, or a disclosure of information to any other public official or law enforcement agency if the employee, in good faith, reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety.* However, an employee may be required to inform the person that the employee made a disclosure of information permitted by this section if the employee represented that the disclosure

24

was the official position of the employee's immediate supervisor or employer.

* * *

5. *Subsection 2 may be enforced through a civil action.*

a. A person who violates subsection 2 is liable to an aggrieved employee for affirmative relief including reinstatement, with or without back pay, civil damages in an amount not to exceed three times the annual wages and benefits received by the aggrieved employee prior to the violation of subsection 2, and any other equitable relief the court deems appropriate, including attorney fees and costs.

b. When a person commits, is committing, or proposes to commit an act in violation of subsection 2, an injunction may be granted through an action in district court to prohibit the person from continuing such acts. The action for injunctive relief may be brought by an aggrieved employee, the attorney general, or a person providing human resource management for the state.

Iowa Code § 70A.28(2), (5) (emphasis added).

The Iowa Supreme Court has "emphasized 'section 70A.28 established 'a public policy against retaliatory discharge of public employees and considers the violation of the policy to be a public harm.'" *Hedlund v. State*, 930 N.W.2d 707, 716 (Iowa 2019) (quoting *Walsh v. Wahlert*, 913 N.W.2d 517, 524 (2018)). The Iowa Supreme Court has also explained that Iowa Code § 70A.28(5), which it called "the whistleblower statute," "expressly creates an independent cause of action in the alternative to administrative remedies under Iowa Code chapter 17A." *Id.* at 712; *see also id.* at 716. Thus, such a claim does not require exhaustion of administrative remedies. *Id.* The court also concluded that "the affirmative relief under section 70A.28(5)(a) is equitable relief." *Id.* at 718.

As to proof of such a claim,

> To engender the whistleblower's statutory remedy, [a state employee] must [1] disclose information to a "public official or law enforcement agency" and [2] reasonably believe "the information evidences a violation of law or rule,

25

> mismanagement, a gross abuse of funds, an abuse of authority,
> or a substantial and specific danger to public health or safety."
> Iowa Code § 70A.28(2).

*Hedlund*, 930 N.W.2d at 717 (bracketed numbers inserted).  Additionally, to prevail on such a claim, the plaintiff must show [3] that the state employer took action or retaliated against the plaintiff "as a reprisal for" the plaintiff's disclosure; [4] the state employer's conduct was a proximate cause of the plaintiff's damage; and [5] the amount of damage. *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 33 (Iowa 2014); *see id.* at 34 (confirming that the plaintiff must prove the adverse action was "a reprisal" for the disclosure, but declining to decide whether that causal connection had to be "determinative" or only a "contributing factor," because the pertinent element in the jury instructions in the case only required that the adverse action be "after" the disclosure, where the parties agreed to submit liability to the jury). The whistleblower's statement must disclose some wrongdoing, as defined by the statute; a statement from a "chronic complainer" is not enough.  *Id.*

### b.    Discussion

Here, the disclosure to a public official, the first element of Ackerman's claim, was Ackerman's testimony to the Oversight Committee, about Wahlert, Hillary, and Lewis. *See Hedlund*, 930 N.W.2d at 717.  As to the second element, such disclosure showed, or Ackerman reasonably believed it showed, a violation of law or rule, mismanagement, a gross abuse of funds, and/or an abuse of authority.  *See id.*  The defendants do not argue otherwise.

In support of summary judgment in their favor on this claim, however, defendants IWD, the State, Wahlert, and Townsend argue that Ackerman is unable to generate a genuine issue of material fact as to whether any adverse action against Akerman was taken "as a reprisal" for any alleged "whistleblower" statements. *See* IOWA CODE § 70A.78(5); *Smith*, 851 N.W.2d 1, 33-34.  Ackerman responds that the adverse actions taken "as a reprisal" were the wrongful and retaliatory negative evaluation, her suspension, and her

termination.  The court concludes that Ackerman has failed to generate a genuine issue of material fact on this element of her whistleblower retaliation claim.  *Mensie*, 917 F.3d at 688 (explaining the non-movant's burden on summary judgment).

First, there is no dispute that the only evaluation after Ackerman's testimony to the Oversight Committee, the evaluation on November 19, 2014, provides an overall rating of "meets expectations."  Pl.'s App. at 145.  While a rational factfinder could find that Wahlert initially marked then scratched out "does not meet expectations," no rational factfinder could conclude that doing so is an adverse employment action, because the final rating was "meets expectations."  *Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).

Ackerman also argues that her suspension with pay was an adverse employment action, which the defendants dispute.   As the Eighth Circuit Court of Appeals has explained, "Placement on paid administrative leave pending an investigation does not meet this standard" of "a tangible change in working conditions that produces a material employment disadvantage."  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1008 (8th Cir. 2012) (citations and quotation marks omitted); *see also Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891–92 (8th Cir. 2005).  Ackerman argues this is only true if the suspended employee is reinstated, rather than fired.  That is not the formulation of the rule stated by the Eighth Circuit Court of Appeals, however.  Moreover, if the suspension with pay ends in termination, it is the *termination* that is the adverse action, not the suspension that precedes it.  *Cf. id.*

The defendants argue that the only employment action taken against Ackerman that can be considered "adverse" was the termination of her employment, but they argue that her termination was not "a reprisal" for her hearing testimony.  They argue that, instead, Ackerman's termination was based upon her multiple false certifications on health insurance forms that her daughter was unmarried and eligible for insurance coverage when, in fact, she was not unmarried; that the termination occurred several months after Ackerman's hearing testimony; and that Townsend, who actually ordered Ackerman's

termination, made a decision that had no connection to Ackerman's hearing testimony. Ackerman argues that the temporal proximity between her protected conduct and the termination is short enough to suggest a causal connection, particularly where, after her testimony to the Oversight Committee, she was on FMLA leave for several weeks, from September 11, 2014, to October 22, 2014.   Moreover, she argues that she relies on inferences of causation from evidence of the defendants' negative attitude toward her, shown in the delay of her annual review on the day she was to testify; Wahlert's and Lewis's pulling together "dirt" on her to use at the hearing; and Wahlert's "disparaging" comments about Ackerman at the hearing.

While there may be inferences that Wahlert, Hillary, and Lewis had some friction with Ackerman, Ackerman has failed to generate genuine issues of material fact that her termination was "a reprisal for" her hearing testimony.   The time between Ackerman's testimony and her termination was not the three years that the Iowa Supreme Court concluded was too long for any inference of causation in *Smith*, 851 N.W.2d at 36. Nevertheless, five months passed between Ackerman's testimony and her termination, and at least three months passed between the end of her FMLA leave and her termination. Moreover, the Iowa Supreme Court has recognized that "the timing between the protected activity and the discharge is insufficient, by itself, to support the causation element of the tort" of wrongful discharge, even when the termination is "shortly after" the protected conduct, which Ackerman's termination was not.  *Jasper v. H. Nizam, Inc*., 764 N.W.2d 751, 768 (Iowa 2009).   Here, the termination was well outside of the timeframe that a rational factfinder could conclude hints at causal connection.  *Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).    In contrast, the investigation, suspension, and termination *were* in close temporal proximity to the discovery by Ms. Semke of Ackerman's allegedly improper certifications in support of her daughter's eligibility for health insurance coverage.   There is no evidence to suggest that Ackerman's insurance misrepresentations were discovered for any reason related to her testimony to the Oversight

Committee.  Also, the suspension occurred only after preliminary verification could be obtained, and the termination occurred only after a reasonable investigation could be conducted, strongly suggesting that the improper certifications—not the hearing testimony—were the cause of Ackerman's termination.

The court also agrees with the defendants that there is a fatal "disconnect" between Ackerman's hearing testimony and her termination, because it is undisputed that Wahlert did not make the termination decision.  Rather, Townsend made that decision, and Ackerman has failed to generate any genuine issues of material fact that Townsend terminated Ackerman "as a reprisal" for Ackerman's hearing testimony, rather than for her improper certifications to obtain insurance coverage for her daughter.  *Mensie*, 917 F.3d at 688 (explaining the non-movant's burden at summary judgment).

Specifically, Townsend was not related in any way to any complaints made by Ackerman at the Oversight Hearing.  Also, Ackerman has pointed to nothing undermining Townsend's testimony that she only became aware that Ackerman had testified before the Oversight Committee after being told by her staff that Ackerman alleged that the investigation into her conduct relating to her insurance coverage for her daughter had been initiated because of her hearing testimony; that Townsend believed the termination was not retaliatory because no other ALJ who had testified negatively about Wahlert had been investigated or disciplined; and that Townsend believed Ackerman's misconduct was sufficiently severe to warrant termination.  Similarly, Ackerman has pointed to nothing to undermine Nelson's testimony that he was not involved with the hearings and did not have any discussions with any staff member about the hearings, where he was the only individual involved in conversations about Ackerman's termination who was employed by IWD at the time of the Oversight Committee hearings.  Moreover, although Mr. Mormann and Ms. Hendricksmeyer claim that they were constructively discharged from their jobs as ALJs with IWD, one shortly before and one shortly after they testified, there is no evidence that Townsend was aware of those claims.  Ackerman also complains that Lewis's false or

"perjurious" hearing testimony about never tape-recording a colleague was treated much differently than Ackerman's false certifications. That circumstance also provides no inference of "reprisal," because Lewis was not similarly-situated to Ackerman in numerous ways, including the nature, the context, and the fraudulent consequences of the alleged misconduct.

Consequently, the defendants' motion for summary judgment on Ackerman's "whistleblower retaliation" claim in violation of IOWA CODE § 70A.28 in Count I is **granted**.

### 2.    *The wrongful discharge claim*

The parties' briefing suggests that it is appropriate to consider, next, Ackerman's claim of discharge in violation of public policy in Count V. This claim is apparently against all defendants. Ackerman alleges that she was discharged from IWD in retaliation for engaging in protected activity, including but not limited to testifying at the Oversight Committee hearing and disclosing information to public officials about Wahlert, Hillary, and Lewis that evidenced a violation of law or rule, mismanagement, a gross abuse of funds, and/or an abuse of authority.

The defendants argue that Ackerman's wrongful discharge claim must be dismissed as a matter of law because of the creation of a civil cause of action by IOWA CODE § 70A.28, citing *Ferguson v. Exide Technologies, Inc.*, 936 N.W. 2d 429, 434-35 (Iowa 2019). In response, Ackerman acknowledges that her wrongful discharge in violation of public policy claim is no longer viable in light of the Iowa Supreme Court's ruling in *Ferguson*.

In *Ferguson*, the Iowa Supreme Court concluded, as an issue of first impression,[3] as follows:

> In keeping with the original purpose of the common law
> action, when the legislature includes a right to civil

---

[3] In *Ferguson*, the court concluded the issue had been presented but not preserved in Ackerman's action before it was removed to this court. 936 N.W.2d at 434 (citing *Ackerman v. State*, 913 N.W.2d 610, 621–22 (Iowa 2018)).

> enforcement in the very statute that contains the public policy
> a common law claim would protect, the common law claim for
> wrongful discharge in violation of public policy becomes
> unnecessary. In this situation, the "legislature has weighed in
> on the issue and established the parameters of the governing
> public policy." *Harvey [v. Care Initiatives, Inc.]*, 634 N.W.2d
> [681,] 686 [(Iowa 2001)]. If the legislature considers the
> remedies it has provided inadequate, it is free to modify them.
> However, we need not provide an alternative court remedy
> when the legislature already provided one. Thus, we hold that
> when a civil cause of action is provided by the legislature in
> the same statute that creates the public policy to be enforced,
> the civil cause of action is the exclusive remedy for violation
> of that statute.

*Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 434–35 (Iowa 2019) (considering whether IOWA CODE § 730.5, the statutory scheme providing for drug and alcohol testing of current and potential employees in Iowa, which provides a civil cause of action, foreclosed a common-law claim of wrongful discharge in violation of public policy).   The Iowa Supreme Court has explained that IOWA CODE § 70A.28(5), "the whistleblower statute" at issue, here, "expressly creates an independent cause of action *in the alternative to* administrative remedies under Iowa Code chapter 17A," *Hedlund*, 930 N.W.2d at 712 (emphasis added); *see also id.* at 716, which means that it is not the "exclusive remedy" for whistleblower retaliation.   Nevertheless, the alternative is *also* a statutory, administrative remedy, not a common-law remedy.   Thus, the court agrees with the parties that Ackerman's common-law claim of wrongful discharge in violation of public policy is foreclosed by her whistleblower retaliation claim pursuant to IOWA CODE § 70A.28.

Consequently, the defendants' motion for summary judgment on this claim is **granted**.

### 3.   *The defamation claim*

Returning to Ackerman's claims in the order in which they were pleaded, in Count II of her Fifth Amended Complaint, Ackerman asserts a defamation claim against Wahlert. She alleges that Wahlert's defamatory statements were outside the scope of Wahlert's

employment and were willful and wanton in reckless disregard of Ackerman's rights. Ackerman does not expressly identify the allegedly defamatory statements in her Fifth Amended Complaint, but she does explain in her briefing of the summary judgment motion that her defamation claim is based on Wahlert's testimony about Ackerman during the Oversight Committee hearing. Wahlert's briefing on summary judgment indicates that she has understood those statements to be the ones at issue in this claim. Wahlert asserts several grounds for summary judgment on this claim, but the court finds it unnecessary to reach all of them.

### a.    *Governing law*

As the Iowa Supreme Court has explained,

> Our defamation law "embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation ... is based upon a violation of this right." *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998) (quoting 50 Am. Jur. 2d *Libel and Slander* § 2, at 338–39 (1995)). We recognize two types of defamation: per quod and per se. *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996).

> Defamation per quod "refer[s] to facts or circumstances beyond the words actually used to establish the defamation." *Id*. To succeed in proving defamation per quod, a party must prove six elements: (1) publication, (2) a defamatory statement, (3) falsity, (4) maliciousness, (5) the statement was of or concerning the party, and (6) a resulting injury. *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013).

> Defamation per se, alternatively, exists when a statement has a "natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Johnson*, 542 N.W.2d at 510 (quoting *Prewitt v. Wilson*, 128 Iowa 198, 202, 103 N.W. 365, 367 (1905)). If a statement is defamatory per se, the elements of falsity, malice, and injury are legally presumed and the statement is actionable without proof of the same. *Schlegel*, 585 N.W.2d at 222.

*Bandstra v. Covenant Reformed Churc*h, 913 N.W.2d 19, 46–47 (Iowa 2018).[4]  Here, Ackerman expressly asserts that Wahlert subjected her to defamation per se, because Wahlert's statements impugned her in her profession.  Ackerman is correct that the Iowa Supreme Court has recognized that "imputations affecting a person in his or her business, trade, profession, or office" are defamatory per se.  *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994).

As the Iowa Supreme Court has explained,

> Qualified privilege is an affirmative defense in a defamation action. *Barreca v. Nickolas*, 683 N.W.2d 111, 116–17 (Iowa 2004).
>
>> The law affords defendants privileges because [s]ometimes one is justified in communicating to others, without liability, defamatory information.... The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.
>
> *Id.* at 116–17 (citation and internal quotation marks omitted). We have recognized that "'[t]he doctrine of privileged communication is based upon the principle of good public policy.'" *Id.* at 117 (quoting *Mills v. Denny*, 245 Iowa 584, 587, 63 N.W.2d 222, 224 (1954)). "Instances abound where the individual must surrender his [or her] personal rights and suffer loss for the benefit of the common welfare." *Mills*, 245 Iowa at 587, 63 N.W.2d at 224.

*Jones v. Univ. of Iowa*, 836 N.W.2d 127, 149 (Iowa 2013).

The Iowa Supreme Court explained the requirements for proof of a qualified privilege defense to a defamation claim, as follows:

---

[4] It appears that, because a common-law defamation claim is based on a different public policy than a statutory whistleblower retaliation claim, it is not foreclosed by the statutory claim. *Compare Ferguson*, 936 N.W.2d at 434-35.  The defendants have not argued otherwise, here.

A communication is qualifiedly privileged if

> (1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

*Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004).

*Bandstra*, 913 N.W.2d at 47–48; *Jones*, 836 N.W.2d at 149. The court continued,

> Qualified privilege may be lost, however, if the speaker abuses the privilege by speaking with actual malice or excessively publishing the statement "beyond the group interest." *Id.* (quoting *Brewer v. Second Baptist Church of L.A.*, 32 Cal.2d 791, 197 P.2d 713, 717 (1948) (en banc)). A statement is made with actual malice if the speaker "acted with knowing or reckless disregard of the truth of the statement." *Barreca*, 683 N.W.2d at 121.

*Bandstra*, 913 N.W.2d at 48; *Jones*, 836 N.W.2d at 149.

Where, as here, the source of the allegedly defamatory statement is a public official, the court must consider whether sovereign immunity bars a defamation claim, which would deprive this court of subject matter jurisdiction over that claim. *See Segura v. State*, 889 N.W.2d 215, 220 (Iowa 2017) ("We have consistently held [sovereign immunity] is a jurisdictional bar."). "By enacting the [Iowa Tort Claims Act (ITA)], the State waived this immunity and opened itself to suit, but it did so strictly on its terms." *Id.* at 221. One of those terms is that "[Iowa Code] [s]ection 669.14(4), [a provision of the ITA] commonly referred to as the intentional tort exception, provides that the State's waiver of sovereign immunity from tort claims does not apply to '[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, *libel, slander*, misrepresentation, deceit, or interference with contract rights.'" *Minor v. State*, 819 N.W.2d 383, 406 (Iowa 2012) (emphasis added) (quoting IOWA CODE § 669.14(4)); *Smith*, 851 N.W.2d at 20. Wahlert concedes, however, that if she was acting outside the scope of

her employment, sovereign immunity under the ITA does not apply, citing *Godfrey v. State*, 847 N.W.2d 578, 586 (Iowa 2014), and the court agrees.

### b.   Discussion

Rather than address all the elements of Ackerman's defamation claim, the court finds the dispositive issues among Wahlert's grounds for summary judgment are whether or not Wahlert is entitled to qualified privilege and/or sovereign immunity. *See* FED. R. CIV. P. 56(a) (a party may move for summary judgment on any claim or defense). Because the court finds some overlap between the arguments concerning these two defenses, the court will begin with qualified privilege.

### i.   Qualified privilege

As to the first element of the qualified privilege defense, whether the statements at issue were made in "good faith," *Bandstra*, 913 N.W.2d at 47, Ackerman argues that there is at least a genuine issue of material fact. She contends this is so, because the night before Wahlert's testimony, which was the evening after Ackerman's testimony, Wahlert directed Lewis to dig up negative information regarding Ackerman and the other ALJs, which Wahlert then used to "disparage" Ackerman and to undermine Ackerman's testimony. While the record evidence shows that Wahlert requested information about the performance of ALJs in IWD and other information to prepare for her own testimony, and even to counter negative testimony about her management of IWD, the record evidence produces no more than a "metaphysical doubt" about whether Wahlert's motives in doing so were to "disparage" Ackerman, which does not meet Ackerman's burden. *Mensie*, 917 F.3d at 688. Contrary to Ackerman's contentions, gathering such information and testifying as Wahlert did, under oath, as the Director of IWD, was to uphold an interest of IWD and the reputation of that agency. *Bandstra*, 913 N.W.2d at 47 (second element of the privilege). It was also limited to that interest. *Id.* (third element of the privilege). This is so, because Senator McCoy had asked Wahlert about her choice of Hillary as a lead worker, based on an evaluation of Hillary's performance in a particular case. No rational

35

factfinder could conclude that it was improper for Wahlert to respond by asserting that all the ALJs had had similar negative evaluations upon occasion, also using specific evaluations of another ALJ as an example.  Furthermore, no rational factfinder could conclude that testimony, under oath, by the Director of IWD at an Oversight Committee hearing concerning the management of her agency was not on a proper occasion, in a proper manner, and to proper parties.  *Bandstra*, 913 N.W.2d at 47 (fourth element of the privilege); *see also Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).  Thus, as a matter of law, qualified privilege applies, here.

Ackerman argues that she can defeat this privilege, however.  *Bandstra*, 913 N.W.2d at 48 ("Qualified privilege may be lost, however, if the speaker abuses the privilege by speaking with actual malice" and "[a] statement is made with actual malice if the speaker acted with knowing or reckless disregard of the truth of the statement." (quotation marks and citations omitted).  She contends that Wahlert testified with malice because she "lied" when she testified that that the DOL made a finding or conducted a review of Ackerman and by asserting that Ackerman "failed" a review, when her score of 89% was actually above the 85% "failure" threshold.  Wahlert argues that she did not testify with knowing or reckless disregard of the truth of the statements, because her statements relating to Ackerman were demonstrably true.

The court notes, first, that one of the factual statements for which Ackerman has failed to provide any supporting evidence from the record is that "the United States Department of Labor ('DOL') never issued any finding that Ackerman displayed attitude, bias, and prejudice, nor did the DOL conduct the reviews referred to by Wahlert."  Pl.'s Statement of Facts, ¶ 55.  Furthermore, the record includes references to "DOL reviews" of the ALJs as a convenient shorthand, even though Wahlert concedes that some evaluations were based on criteria set by the DOL and that some evaluations were performed by IWD personnel.  *See, e.g.* Pl.'s App. at 57.  Also, although the parties dispute whether a failing evaluation was below 90% or below 85%, Ackerman has not pointed to

evidence undermining Wahlert's deposition testimony that it was her recollection that a "fail" on the evaluation was less than 90%, although two "fails" were required for an evaluation of "does not meet expectations." *Id*. at 57-59.  On this record, no rational factfinder could conclude that Wahlert's statements were malicious because they were either knowing or in reckless disregard of the truth.  *See Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).

Thus, as a matter of law, Wahlert's allegedly defamatory statements were qualifiedly privileged.  The defendants' motion for summary judgment on this claim is **granted**.

### ii.    *Sovereign immunity*

In the alternative, but for similar reasons, Wahlert is entitled to sovereign immunity to Ackerman's defamation claim.  Wahlert concedes that if she was acting outside the scope of her employment, sovereign immunity under the ITA does not apply.  Wahlert argues, however, that the undisputed facts indicate that she was acting within the scope of her employment as the Director of IWD when she made the allegedly defamatory statements, under oath, before the Oversight Committee.  Ackerman responds that an employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended to serve any purpose of the employer, and determination of whether Wahlert's intent and purpose were to slander Ackerman are questions not suitable for summary judgment.  This is so, she argues, because the record suggests that Wahlert's statements were intended to discredit Ackerman, who had testified critically of Wahlert just a day earlier, were not responsive to the question that prompted them, and were not necessary to accomplish a legitimate purpose of her appearance.

As mentioned, above, Wahlert loses sovereign immunity only if she was not acting within the scope of her employment.  *See Godfrey*, 847 N.W.2d at 586.  As the Iowa Supreme Court has explained,

> Section 669.2 of ITCA sets forth the following
> definition:  "'Acting within the scope of the employee's office

37

> or employment' means acting in the employee's line of duty as
> an employee of the state." Iowa Code § 669.2(1). At common
> law we have explained the scope of employment concept as
> follows:
>
> > for an act to be within the scope of employment the
> > conduct complained of must be of the same general
> > nature as that authorized or incidental to the conduct
> > authorized. Thus, an act is deemed to be within the
> > scope of one's employment where such act is necessary
> > to accomplish the purpose of the employment and is
> > intended for such purpose. The question, therefore, is
> > whether the employee's conduct is so unlike that
> > authorized that it is substantially different.
>
> *Godar v. Edwards*, 588 N.W.2d 701, 705–06 (Iowa 1999)
> (citations and internal quotation marks omitted). While we
> acknowledge *Godar* discusses scope of employment in the
> context of respondeat superior, we find this common law
> formulation instructive.

*Jones*, 836 N.W.2d at 143.

In light of this definition, the court concludes that Ackerman relies on "metaphysical doubts," not genuine issues of material fact generated by the record evidence, to assert that Wahlert was acting outside the scope of her employment. *Mensie*, 917 F.3d at 688 (explaining the non-movant's burden on summary judgment). As this court explained, above, contrary to Ackerman's contentions, testifying as Wahlert did, under oath, as the Director of IWD, was to uphold an interest of IWD and the reputation of that agency and, thus, was acting in her line of duty as an employee of the state. *Jones*, 836 N.W.2d at 143. That testimony was incidental to the conduct expressly authorized for someone in her position, necessary to accomplish the purpose of the employment, and was intended for such purpose. *Id.* Although Ackerman seems to contend that Wahlert's testimony was so unlike that authorized that it is substantially different and, thus, outside the scope of her employment, *id.*, again, no rational factfinder could conclude that it was improper for Wahlert to respond to Senator McCoy's criticism of one ALJ by asserting that all the ALJs

had had similar negative evaluations upon occasion, also using specific evaluations of another ALJ as an example. *Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).

Consequently, the court concludes that the defendants' motion for summary judgment on Ackerman's defamation claim in Count II is **granted** on the basis of sovereign immunity, as well as on the basis of qualified privilege.

### 4.    *The federal free speech retaliation claim*

In Count III, Ackerman asserts a claim of violation of her rights under the First Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, apparently against all the individual defendants in their individual capacities.  This claim is based on exercise of her free speech rights under the First Amendment when she testified as a private citizen concerning a matter of public interest at the Committee hearing, for which she alleges the defendants subjected her to adverse employment action, a hostile work environment, attempts to interfere or disrupt her employment opportunities, an ethics complaint, and a criminal case against her.  The defendants seek summary judgment on this claim on several grounds, including failure to show adverse action as a result of Ackerman's hearing testimony, failure to show the defendants would not have reached the same decision to terminate her regardless of her hearing testimony, and failure to articulate how each individual defendant's actions violated her right to free speech.  The summary of the applicable law and the court's analysis, below, will focus on the grounds the court finds dispositive.

### a.    *Governing law*

This court's first inquiry in the case of a public employee's claim of free speech retaliation in violation of the First Amendment, concerning either the claim or a qualified immunity defense, is whether the plaintiff "has established a First Amendment violation." *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020).  As the Eighth Circuit Court of Appeals has explained,

> "To establish a prima-facie case of unlawful retaliation for protected speech," [the plaintiff] must prove three elements.

> *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009). First, [the plaintiff] must prove "he engaged in an activity protected by the First Amendment." *Id.* Second, [the plaintiff] must prove [the public employer] "took an adverse employment action against him." *Id.* And third, [the plaintiff] must prove the "protected speech was a substantial or motivating factor in [the public employer's] decision to take the adverse employment action." *Id.*

*Henry*, 950 F.3d at 1011.

As to the third, "substantial or motivating factor" element of the prima facie case, the Eighth Circuit Court of Appeals has explained,

> While causation is generally a jury question, this court must decide if sufficient evidence exists to create a factual question for the jury. *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008). To make this determination we must undertake an additional three-part, burden-shifting inquiry: First, "a public employee must show that he suffered an adverse employment action that was causally connected to his participation in a protected activity." *Id.* at 1018–19. If the employee so demonstrates, "the burden shifts to the employer to show a legitimate, nondiscriminatory reason for his or her actions." *Id.* at 1019. If the employer establishes such a reason, "the burden shifts back to the employee to show that the employer's actions were a pretext for illegal retaliation." *Id.*

*Henry*, 950 F.3d at 1014.

In *Henry*, the Eighth Circuit Court of Appeals assumed without deciding that the first part of this burden-shifting inquiry on causation was met, "even though the causation question [wa]s not without doubt," because the parties agreed that the plaintiff had suffered an adverse employment action.  950 F.3d 1014.  On the other hand, the court directly addressed the causation issue in *Auer v. City of Minot*, 896 F.3d 854 (8th Cir. 2018).  In *Auer*, the court explained that "'more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'"  896 F.3d at 860 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)).  The court added that "inferring causation from timing

would be particularly inappropriate," where "an obvious alternative explanation for the decision exists." *Id*. at 860-61.

As to the remaining parts of the burden-shifting analysis of causation, where the employer offers a legitimate reason for the adverse action, such as unprotected conduct, "[f]or [the plaintiff] to prevail then, he must establish a factual question exists as to whether [the employer's] reasons were mere pretext." *Henry*, 950 F.3d at 1014.   The court explained,

> [This is] a difficult burden to prove "because evidence of pretext and discrimination is viewed in the light of the employer's justifications." [*Morris*, 512 F.3d], at 1019. Such a pretext typically may be shown by offering evidence the employer's explanation lacked basis in fact, evidence the employee recently received favorable reviews, evidence the employer's proffered reason for its employment decision changed over time, or with evidence the employer treated similarly situated employees who engaged in the protected activity more favorably. *Ebersole v. Novo Nordisk, Inc*., 758 F.3d 917, 935 (8th Cir. 2014).

*Henry*, 950 F.3d at 1014–15.  Where the employer's disciplinary actions "were based in fact," were "specifically related" to the employee's unprotected conduct, and there was no evidence that the employer's reasons "changed over time," there is no inference of pretext. *Id*. at 1015.  To rely on different treatment of similarly-situated employees to establish pretext, "comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id*. (internal quotation marks and citations omitted).

If the plaintiff fails to make the necessary showing that protected activity was a "substantial" or "motivating factor" for the adverse action, the plaintiff fails as a matter of law to show a constitutional violation, and the defendants are also entitled to qualified immunity to the free speech retaliation claim.  *Id.*

### b.    *Discussion*

Here, the defendants do not dispute that Ackerman's testimony before the Oversight Committee was "testimonial speech" that is "protected speech activity." *Id.* at 1011 (first element of the prima facie case).  Nor do the defendants dispute that Ackerman suffered at least some adverse employment action.  *Id.* (second element).  They do, however, dispute whether Ackerman's protected speech was a "substantial or motivating factor" in such adverse employment action.  Thus, the court turns to the three-part burden-shifting analysis of that question.  *Id.* at 1014.  Although causation is ordinarily a jury question, the "court must decide if sufficient evidence exists to create a factual question for the jury."  *Id.*  This court concludes that there is not, for many of the same reasons that there was not sufficient evidence to create a factual question for the jury on Ackerman's whistleblower retaliation claim.

Again, Ackerman's assertions of an inference of causation from "temporal proximity" are insufficient.  Five months passed between Ackerman's testimony and her termination, and at least three months passed between the end of her FMLA leave and her termination, which means the adverse action was not in "temporal proximity" to the protected activity.  Moreover, in *Auer*, in a free speech retaliation case, the court explained that "'more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'"  896 F.3d at 860 (quoting *Kiel*, 169 F.3d at 1136).  Thus, no rational factfinder could find causation based on "temporal proximity" in this case.  *Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).

In contrast, the suspension and termination *were* in close temporal proximity to the discovery by Ms. Semke of Ackerman's allegedly improper certifications in support of her daughter's eligibility for health insurance coverage.  There is no evidence that Ackerman's insurance problem was discovered for any reason related to her testimony to the Oversight Committee.  Also, the suspension occurred only after preliminary verification could be

obtained, and the termination occurred only after a reasonable investigation could be conducted, strongly suggesting that the improper certifications—not the hearing testimony—were the cause of Ackerman's termination.   Thus, this is a case in which "inferring causation from timing would be particularly inappropriate," because "an obvious alternative explanation for the decision exists," and that alternative explanation stands in closer proximity to the suspension and termination than Ackerman's protected conduct. *Id*. at 860-61.

Ackerman also cannot show that the defendants' legitimate reason for her suspension and termination—or, indeed, her criminal prosecution or her charge with an ethical violation—was pretextual.   Again, there is a fatal "disconnect" between Ackerman's protected hearing testimony and her termination, because it is undisputed that Wahlert did not make the termination decision.   Rather, Townsend made that decision, and Ackerman has failed to generate any genuine issues of material fact that Townsend's decision to terminate Ackerman for improper certifications to obtain insurance coverage for her daughter was a pretext for terminating her for her protected testimony to the Oversight Committee.   *Mensie*, 917 F.3d at 688 (explaining the non-movant's burden at summary judgment).   Specifically, Townsend was not related in any way to any complaints made by Ackerman at the Oversight Hearing.   Also, Ackerman has pointed to nothing undermining Townsend's testimony that she only became aware that Ackerman had testified before the Oversight Committee after being told by her staff that Ackerman alleged that the investigation into her conduct relating to her insurance coverage for her daughter had been initiated because of her hearing testimony; that Townsend believed the termination was not retaliatory, because no other ALJ who had testified negatively about Wahlert had been investigated or disciplined; and that Townsend believed Ackerman's misconduct was sufficiently severe to warrant termination.

Similarly, Ackerman has pointed to nothing to undermine Nelson's testimony that he was not involved with the hearings and did not have any discussions with any staff

member about the hearings, where he was the only individual involved in conversations about Ackerman's termination who was employed by IWD at the time of the Oversight Committee hearings.  Moreover, although Mr. Mormann and Ms. Hendricksmeyer claim that they were constructively discharged from their jobs with IWD, one shortly before and one shortly after they testified, there is no evidence that Townsend was aware of those claims.

In short, the disciplinary, ethical, and criminal actions against Ackerman "were based in fact," were "specifically related" to Ackerman's unprotected conduct, and there was no evidence that the employer's reasons "changed over time," so there is no inference of pretext.  *Henry*, 950 F.3d at 1015.

Ackerman also attempts to establish pretext by showing different treatment of similarly-situated employees.  *Id.* (recognizing that such evidence may show pretext).  Ackerman complains that Lewis's false or "perjurious" hearing testimony about never tape-recording a colleague was treated much differently than Ackerman's false certifications.  To produce the required inference, "comparators must have dealt with the same supervisor, have been subject to the same standards, *and engaged in the same conduct without any mitigating or distinguishing circumstances*."  *Id*. (internal quotation marks and citations omitted; emphasis added).  Lewis was not similarly-situated to Ackerman in numerous ways, including the nature, the context, and the fraudulent consequences of the alleged misconduct.

Because Ackerman fails to make the necessary showing that protected activity was a "substantial" or "motivating factor" for the adverse action to defeat summary judgment, she fails as a matter of law to show a constitutional violation, and the defendants are also entitled to qualified immunity to the free speech retaliation claim in Count III.  *Id.* Consequently, the defendants' motion for summary judgment on this claim is **granted**.

44

### 5. *The intentional infliction of emotional distress claim*

In Count IV, Ackerman asserts a claim for intentional infliction of emotional distress apparently against all defendants.   Ackerman alleges that the conduct of defendants—including creation of a hostile work environment, the negative evaluations, suspension, termination, ethics complaint, and criminal case—was and has been outrageous.   She contends that, by engaging in this conduct, the defendants intentionally caused emotional distress or acted with reckless disregard of the probability of causing emotional distress to her, and that she has suffered severe emotional distress as a direct and proximate result of that conduct.   Once again, the defendants seek summary judgment on this claim on several grounds.

### a. *Governing law*

As the Iowa Supreme Court has explained,

> To succeed on [an intentional infliction of emotional distress] claim, [the plaintiff] must demonstrate four elements:
>
> > (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.
>
> *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 123–24 (Iowa 2004)). [The plaintiff] must establish a prima facie case for the outrageous conduct element. *Id.* For emotional distress cases, "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (quoting *M.H. by and through Callahan v. State*, 385 N.W.2d 533, 540 (Iowa 1986)).

*Hedlund v. State*, 930 N.W.2d 707, 723–24 (Iowa 2019).

The Iowa Supreme Court has made clear that the standard for conduct that is sufficiently outrageous to support such a claim is remarkably hard to meet in general and "'especially in employment cases.'" *Id*. at 724 (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 157 (Iowa 1996), *abrogated on other grounds by Godfrey v. State*, 898 N.W.2d 844, 864, 872 (Iowa 2017)).

> We have said the outrageous conduct "must be extremely egregious; mere insults, bad manners, or hurt feelings are insufficient." [*Van Baale*, 550 N.W.2d] at 156.
>
> > Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
> >
> > Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> *Northrup v. Farmland Indus., Inc*., 372 N.W.2d 193, 198 (Iowa 1985) (en banc) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (Am. Law Inst. 1965)). We require substantial evidence of extreme conduct. *Vinson v. Linn-Mar Cmty. Sch. Dist*., 360 N.W.2d 108, 118 (Iowa 1984).

*Hedlund*, 930 N.W.2d at 724.

For present purposes, it is sufficient to note that the Iowa Supreme Court has also explained as follows:

> "When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." *Vaughn v. Ag Processing, Inc*., 459 N.W.2d 627, 636 (Iowa 1990) (en banc) (citation omitted). "Despite our caselaw that indicates an employer 'has a duty to refrain from abusive behavior toward employees,' we have often found that conduct by employers and coworkers did not

46

> rise to the level of outrageous conduct." *Smith*, 851 N.W.2d at
> 26 (quoting *Vinson*, 360 N.W.2d at 118).

*Hedlund*, 930 N.W.2d at 724 (citing cases).

### b.    *Discussion*

The defendants argue that Ackerman has failed to raise any genuine issue of material fact with respect to the "outrageousness" of any of their conduct.  They also contend that Ackerman has marshaled insufficient evidence of severe emotional distress, the defendants' intent to inflict such distress, or that any of their conduct was the actual and proximate cause of Ackerman's distress.  Ackerman responds that she has met her burden to generate a fact question on the intentional infliction of emotional distress claim owing to the nature of the conduct directed at her, the position of the individuals engaging in the conduct, the number of individuals participating in the conduct, the long time period the conduct continued, and her status as an individual engaged in a protected activity both by statute and by policy.  Indeed, she asserts that her status as a whistleblower is perhaps the most important point in establishing the outrageous nature of the conduct.  She also contends that she has presented "compelling" evidence that the alleged conduct caused severe emotional distress, specifically, her depression, stress, and anxiety.

Although the parties did not raise the issue, the court concludes that Ackerman's intentional infliction of emotional distress claim is foreclosed by her statutory whistleblower retaliation claim to the extent that the common-law claim is based on the alleged "outrageousness" of the retaliation for her whistleblowing.  Ackerman appears to rely on the same public policy behind Iowa Code § 70A.28 as the basis for her contentions that the retaliation for her whistleblowing was "outrageous," but the Iowa legislature has provided a civil cause of action as a remedy for that retaliation.  *See Ferguson*, 936 N.W.2d at 434-35 (explaining that a public policy based common-law claim is foreclosed when a statute provides a civil cause of action intended to be exclusive).

Even if the claim is not foreclosed in whole or in part, however, for many of the reasons that the court has found Ackerman failed to generate genuine issues of material

fact on her whistleblower retaliation claim, her defamation claim, and her free speech retaliation claim, the court now finds that Ackerman has failed to demonstrate, in the first instance, that the conduct complained of may reasonably be regarded as sufficiently "outrageous." *See Hedlund*, 930 N.W.2d at 724 (explaining that this issue is for the court to determine as a matter of law). Wahlert's preparation to testify to the Oversight Committee and her testimony about Ackerman, while perhaps harsh, was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *id.*, considering the context and purpose of the hearings, including Wahlert's position as the Director of IWD and that she was responding to a question from the Committee. Moreover, Ackerman's investigation, suspension, termination, referral for possible criminal prosecution, and referral in an ethics complaint, were all reasonably based on evidence of wrongdoing with regard to the insurance applications for her married daughter, so that they fall well short of the standard for "outrageousness." *Id.* Those actions are not made "outrageous" by Ackerman's complaints that Lewis's false or "perjurious" hearing testimony about never tape-recording a colleague was treated much differently than Ackerman's false certifications, because Lewis was not similarly-situated to Ackerman in numerous ways, including the nature, the context, and the fraudulent consequences of the alleged misconduct, so that the difference in treatment also falls well short of the standard for "outrageousness." *Id.*

Despite allegations that Ackerman suffered harassing and even abusive behavior from Wahlert, Hillary, and Lewis, these are the kinds of unkind and inconsiderate acts that are not compensable, because the employment context requires a reasonable level of tolerance. *Hedlund*, 930 N.W.2d at 924. These circumstances are not more egregious than those the Iowa Supreme Court has found insufficient to support a claim of intentional infliction of emotional distress. *See id.* (citing cases). Nelson's questions to Ackerman

about her FMLA leave and sick leave were well within the realm of reasonable employer inquiries, so that they also fall well short of the standard for "outrageousness." *Id.*

In short, even considering the entirety of the allegedly harassing and abusive conduct to which Ackerman was subjected and the length of time she endured such conduct, the court concludes, as a matter of law, that Ackerman has failed to demonstrate, in the first instance, that the conduct complained of may reasonably be regarded as sufficiently "outrageous." *Id.* In these circumstances, the court need not consider any of the other grounds the defendants assert for summary judgment on this claim.

The defendants' motion for summary judgment on Ackerman's intentional infliction of emotional distress claim in Count IV is **granted**.

### 6.     *The Iowa constitutional claim*

Ackerman's last claim, in Count VI of her Fifth Amended Complaint, asserts violation of her right to free speech protected by article I, § 7 of the Iowa Constitution against the individual defendants. This claim is based on essentially the same allegations as Ackerman's federal constitutional claim in Count III. Somewhat more specifically, she alleges that she testified as a private citizen concerning a matter of public interest at the Oversight Committee hearing; that she was subject to adverse employment action, a hostile work environment, and attempts to interfere or disrupt her employment opportunities and work for doing so; and that she was also subject to retaliatory actions for speaking out in the form of the filing of the ethics complaint and the criminal case against her. The defendants challenge this claim on the basis of Eleventh Amendment immunity and "all due care" qualified immunity defenses. The court will consider those defenses in turn.

### a.     *Eleventh Amendment immunity*

The defendants' Eleventh Amendment immunity argument has two prongs. First, the defendants argue that they are unaware of any state court case expressly recognizing a constitutional tort for money damages based on a free speech retaliation claim pursuant to article I, § 7 of the Iowa Constitution and that that provision is not self-executing. Second,

even supposing the state has waived immunity to suit on such a claim, the defendants argue that the state has not waived immunity to suit on such a claim in federal court, simply by removing this action to this court.  The defendants argue that they did not waive immunity by removing this action, because the Iowa constitutional claim was not part of Ackerman's complaint at the time of removal; rather, it was only added several months after removal.

Ackerman argues that the free speech clause in article I, § 7, is self-executing, like the due process and equal protection clauses in article I at issue in *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), and the search and seizure clause in article I at issue in *Baldwin v. City of Esterville*, 915 N.W.2d 279 (Iowa 2018).  She also argues that the defendants waived Eleventh Amendment immunity to suit in this court by removing this action to this federal court, even before she pleaded her Iowa constitutional claim.  Furthermore, she argues that the defendants waived that immunity by consenting to her amendment to add such a claim to the Fifth Amended Complaint.

The court notes, first, that Eleventh Amendment immunity is only "'one particular exemplification'" of sovereign immunity.  *Church v. Missouri*, 913 F.3d 736, 742 (8th Cir. 2019) (quoting *Federal Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 753 (2002)).  States enjoy sovereign immunity that is broader than Eleventh Amendment immunity, because they have immunity to *all* private suits, whether in state or federal court. *Id*.  The state's waiver of that sovereign immunity must occur before there can be any question of waiver of Eleventh Amendment immunity of a state to suit against it in federal court.  *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (citing *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619-20 (2002)).  Eleventh Amendment immunity to suit in federal court can then be waived by litigation conduct, for example, when a state removes a case to federal court.  *See Church*, 913 F.3d at 742 (citing *Lapides*, 535 U.S. at 624).  Specifically, in *Lapides*, the Supreme Court "conclude[ed] a state may not remove a case to federal court and then attempt to assert immunity that would not have

been available in state court." *Kruger*, 820 F.3d at 301 (citing *Lapides*, 535 U.S. at 619-20).

The court will assume, without deciding, that the provision of article I of the Iowa Constitution at issue, here, is self-executing, thus waiving sovereign immunity, for the same reasons that the provisions at issue in *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), and *Baldwin v. City of Esterville*, 915 N.W.2d 279 (Iowa 2018), were found to be self-executing. Thus, the question is not whether sovereign immunity has been waived, but whether Eleventh Amendment immunity to suit in federal court has been waived.

On that question, the court is not convinced by Ackerman's argument that the defendants waived Eleventh Amendment immunity to the Iowa constitutional claim she now asserts by removing this action to this federal court *before* that claim was even pleaded. Moreover, in the court's view, it is improper to infer waiver where the defendants were merely aware before removal that Ackerman intended to assert an Iowa constitutional claim, as Ackerman contends, because such a claim might never materialize.

What the court finds more troubling is that the defendants consented to the amendment adding the Iowa constitutional claim, then waited from May 30, 2019, when the Fifth Amended Complaint was filed, until March 2, 2020, when they moved for summary judgment, to challenge the Iowa constitutional claim on Eleventh Amendment immunity grounds. Nevertheless, the court must hold that the assertion of Eleventh Amendment immunity is timely, where the defendants did plead in their Answer to the Fifth Amended Complaint an affirmative defense that "[s]ome or all of Plaintiff's claims may be barred by sovereign immunity." Answer, Affirmative Defenses, ¶ 3; *see Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 547 (2002) (finding that the defendant did not waive Eleventh Amendment immunity by waiting until ten months after federal lawsuits were filed, because the defendant raised its Eleventh Amendment defense "at the earliest possible opportunity" by including that defense in its answers). In these circumstances, the court cannot find that the defendants "unequivocally expressed" their

consent to be sued in federal court by delaying for several months a motion for summary judgment on this claim based on the Eleventh Amendment immunity defense they had pleaded.  *See Raygor*, 534 U.S. at 547.

Thus, the defendants' motion for summary judgment on Ackerman's Iowa constitutional claim in Count VI is **granted** based on Eleventh Amendment immunity to that claim in federal court.

### b.      *"All due care" qualified immunity*

In addition, or in the alternative, the court will consider the defendants' argument that they are also entitled to "all due care" qualified immunity to the Iowa constitutional claim, as that defense was established in *Baldwin v. City of Estherville*, 915 N.W.2d 259 (Iowa 2018).  In their Answer to Ackerman's Fifth Amended Complaint, the defendants did plead as an affirmative defense that "Plaintiff's claims may be barred by the doctrine of qualified immunity and/or Defendants' exercise of all due care."  Answer, Affirmative Defenses, ¶ 11.

The defendants argue that the court should grant them summary judgment on Ackerman's Iowa constitutional claim, as asserted against the individual defendants, on the basis of the "all due care" defense for the reasons that they argued the individual defendants' behavior did not warrant liability on Ackerman's federal constitutional claim. Ackerman responds that the entirety of her submissions, at the very least, generates a question of fact for the jury as to whether the defendants acted with "all due care."  She also argues that the "all due care" affirmative defense only applies to the individual defendants, so her Iowa constitutional claim against the State and IWD are not subject to this defense and should survive.

Taking Ackerman's last argument first, her Iowa constitutional claim is expressly pleaded as "against individual defendants."  Fifth Amended Complaint, Count VI.  Thus, Ackerman has *not* asserted such a claim against the State and IWD.  Therefore, this claim depends entirely upon whether the individual defendants exercised "all due care."

What is problematic is that the Iowa Supreme Court has so far declined to provide more clarification of the "all due care" standard or to apply it to specific factual circumstances.  *See Baldwin v. City of Estherville*, 929 N.W.2d 691, 698 (Iowa 2019). Nevertheless, then-District Judge Mark W. Bennett, of the Northern District of Iowa, concluded that the Iowa Supreme Court's discussion of the new defense "reinforce[d] the understanding of the 'all due care' qualified immunity defense as embodying a 'negligence' standard." *Baldwin v. Estherville, Iowa*, 333 F. Supp. 3d 817, 843 (N.D. Iowa 2018) (citing *Baldwin*, 915 N.W.2d at 280-281).  He also observed, "The distinction [between the Iowa standard and the federal standard] appears to me to be between *taking reasonable action* to 'conform' to the requirements of the law, under the Iowa 'all due care' qualified immunity standard, and *avoiding action* one should reasonably know would violate the law, under the . . . federal qualified immunity standard." *Id.* (emphasis in the original).  He also suggested "that 'bad faith,' 'malice and lack of probable cause,' and lack of 'reasonable ground' for the conduct in question are factors suggesting that the 'all due care' qualified immunity defense is inapplicable." *Id*. at 843-45.

Adopting this clarification of the "all due care" standard of qualified immunity to Iowa constitutional claims, the court concludes that the "all due care" defense does defeat Ackerman's Iowa constitutional claim, here.  This is so, for many of the same reasons her other claims also fail.

Specifically, Hillary and Lewis may have contributed to what Ackerman describes as "harassment," but the court has already concluded their conduct involved only the kinds of unkind and inconsiderate acts that are not compensable, because the employment context requires a reasonable level of tolerance.  That said, their conduct does not involve negligent or malicious violation of Ackerman's free speech rights, but conformance to the requirements of the law.  Furthermore, there is no evidence that they were directly involved in Ackerman's suspension, termination, the filing of an ethics complaint, or the filing of a criminal case against her.  Likewise, Nelson's questions to Ackerman about her FMLA

leave and sick leave were well within the realm of reasonable employer inquiries, so that they fall well short of the standard for "negligence" or "maliciousness."  Nelson also did nothing in relation to Ackerman's suspension, termination, ethics complaint, or criminal case that was not based on a good faith assessment of the evidence of Ackerman's fraudulent conduct.

Similarly, where the undisputed evidence is that Townsend took reasonable care to assure herself that the suspension, termination, ethics complaint, and criminal case were not prompted by Ackerman's testimony to the Oversight Committee and were based on sufficient evidence of wrongdoing, she exercised "all due care" to avoid any violation of Ackerman's rights.  Finally, Wahlert is also entitled to "all due care" qualified immunity, where her statements and actions with regard to the Oversight Committee were all within the reasonable scope of her official duties and were reasonable responses to questions presented to her by the Committee.  Wahlert may well have disliked Ackerman, but the court reiterates that there is no evidence to generate a genuine issue of material fact of "malice" sufficient to strip her of "all due care" qualified immunity.

Therefore, in addition or in the alternative to granting the defendants' motion for summary judgment on Count VI on the basis of Eleventh Amendment immunity, the court concludes that the defendants' motion for summary judgment on that claim is **granted** on the basis of "all due care" qualified immunity.

## IV.   CONCLUSION

Ackerman may have suffered inappropriate treatment as well as appropriate treatment prior to her termination from her ALJ position at IWD.  She has not generated genuine issues of material fact that defeat summary judgment on any of her claims in this protracted litigation, however.

Therefore, upon the foregoing,

**IT IS ORDERED** that

1.      the defendants' April 10, 2020, Motion To Strike Plaintiff's Statement Of Disputed Material Facts [Dkt. No. 41] is **denied as moot**; and

2.      the defendants' February 28, 2020, Motion For Summary Judgment [Dkt. No. 27] is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of the defendants.

**DATED** this 19th day of May, 2020.

_____
JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA